**HORNE PLUMBING AND HEATING COMPANY, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and John T. Dunlop, Secretary of Labor, Respondents.**

No. 74–3897.

United States Court of Appeals, Fifth Circuit.

Feb. 26, 1976.

Ira J. Smotherman, Jr., McNeill Stokes, Atlanta, Ga., for petitioner.

William S. McLaughlin, Executive Secretary, OSHRC, Peter J. Brennan, Secretary of Labor, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrel, Regional Sol., Dept. of Labor, Atlanta, Ga., T. A. Housh, Jr., Counsel for Regional Litigation, U. S. Dept. of Labor, Michael H. Levin, Counsel for Appellate Litigation, U. S. Dept. of Labor, Stephen F. Eilperin, Larry R. O'Neal, Allen H. Sachsel, Dept. of Justice, Appellate Section, Civ. Div., Washington, D. C., for respondents.

Before GEWIN, BELL * and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

Petitioner Horne Plumbing & Heating Company seeks review under 29 U.S.C. § 660(a) of an order of the Occupational Safety and Health Review Commission (the Commission) upholding the administrative law judge's decision that the company violated § 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2), by (1) failing properly to shore the sides of a trench, 29 C.F.R. 1926.652(b), and (2) storing dirt within two feet of the edge of a trench, 29 C.F.R. 1926.651(i)(1). A penalty of $1000 was assessed. Finding that the decision rests on an incorrect theory of law, we vacate.

Petitioner Horne is a sole proprietorship with approximately eleven employees. In May and June of 1972, Horne was engaged in excavating a trench and laying sewer pipe in Chamblee, Georgia. Prior to the commencement of the excavation, the company provided supplies

---

* Judge Bell participated fully in the decision of this case and concurred in this opinion prior to the effective date of his resignation, March 1, 1976.

for shoring the sides of the trench, and Fred Horne, the company's owner, instructed and cautioned his men to shore the trench. On May 18, Mr. Horne visited the job site and observed Sam Cox and another employee making up the shoring to be used in the ditch; he then left in order to attend a safety seminar out of town.

On May 19, as the trench was being dug by a backhoe, employees put the shoring in place and laid the pipes. Contrary to instructions, solid plywood sheeting, which had been provided by Horne, was not used in the shoring. Also contrary to specific instructions and despite continued warnings from fellow employees and the operating engineer who was excavating the ditch, two Horne employees—J. W. Chupp, the job foreman, and Sam Cox, also an experienced foreman—worked in unshored portions of the ditch.[1] When the backhoe was about fifty feet ahead of the shored section of the ditch, a cave-in began at the backhoe and continued along the ditch to the point of the first bracing; none of the shored portion collapsed. Chupp and Cox were working ten to fifteen feet beyond the shored area when the cave-in occurred, and both were killed.

Shortly after the accident, a compliance officer of the Occupational Safety and Health Administration (OSHA) inspected the worksite, finishing the inspection the following Monday, May 22. This resulted in a June 8, 1972 citation alleging serious violations of the Act in failing properly to shore the sides of a trench and storing excavated material within two feet of the edge of a trench.[2]

Prior to re-excavation of the ditch, which began on June 12, 1972, Mr. Horne made a written summary of pertinent OSHA and county regulations, and informed the Administration and the county inspector of the re-excavation plans. He instructed his subcontractor, T & K Pipeline Company, to remove all excavated dirt to at least three feet from the edge of the ditch, and he contracted with T & K for an extra bulldozer, whose sole function was to remove and deposit dirt in two piles seventy and forty feet away. Mr. Horne was personally present all of the first day of re-excavation. On the second day he left for a few hours to prepare his payroll. During his absence, the site was inspected again, and another citation for a serious violation—storing dirt within two feet of the excavation—was issued.

It is undisputed that Horne had an outstanding safety program for a small employer. Prior to the May 19 accident, the company had a record of almost twenty years without a lost-time accident. Mr. Horne held group safety meetings with his employees, and also conducted on-the-job meetings with individuals; he issued written handouts concerning safety instructions and the requirements of the Act. A safety expert testified that Horne's safety program "in many cases far exceeds that of other contractor management of similar size."

Both men killed in the accident were experienced foremen and journeymen plumbers; each had been licensed for more than twenty years. They understood Mr. Horne's safety instructions; they were trained and highly experienced in the use of shoring; and they had always used shoring properly in pre-

---

1. The record reveals a rather cavalier attitude on the part of Chupp and Cox toward the obvious dangers to which their conduct exposed them. The backhoe operator testified that he had repeatedly warned the men of the danger, and that Chupp "just told me that he was the foreman out there." Charles Cox, a Horne employee and brother of the deceased Sam Cox, admonished both men approximately five minutes before the cave-in not to work in the unshored area. Another employee, Brooks, expressed concern only minutes be-

fore the accident. Brooks, although he remained within the shored area, was so nervous that Chupp told him, "You get out of here because you'll be running over some of us." Sam Cox chided Brooks for his concern, telling him "that [he] wouldn't have to worry about the ditch if [he] was all right with God."

2. The excavated dirt had been piled next to the ditch apparently pursuant to Chupp's instructions to the backhoe operator.

vious jobs, including one immediately preceding the Chamblee excavation.

The administrative law judge held that Horne was in serious violation of the Act and assessed a penalty of $500 for each citation. OSHRC Docket Nos. 1096 and 1261, February 9, 1973. The judge stated: "The evidence is clear that Mr. Horne was diligent in providing for the safety of his employees, and there was no dispute that his foreman understood his policy and instructions. It also appears that he had no reason to believe his policy and instructions would be disregarded by his foreman." *Id.* at 11. Nevertheless, he rejected Horne's defense "that he should not be liable for violations which occurred as the result of his employee's misconduct"; and that "he did not and could not with the exercise of reasonable diligence, know of the presence of the violations within the purview of section 17(k) of the Act."[3] *Id.* at 10. Basing his decision on an agency theory, the judge held that "on the basis of the facts presented here, the foreman is deemed to be part of management. . . . Respondent cannot be heard to deny his responsibility under the Act by charging that his foreman failed to meet the standards as required by the Secre-

tary." *Id.* at 12. Regarding the second citation, the judge concluded: "Mr. Horne himself testified that he had a foreman on the job who had the authority to correct any problems. . . . It will serve no useful purpose to repeat the principles of agency law as previously set forth, however, the discussion regarding safety measures, and the respondent-foreman relationship, equally applies here and is so adopted." The Commission, finding "no prejudicial error," affirmed. OSHRC Docket Nos. 1096 & 1261, October 9, 1974.

■ The Commission's order is due to be affirmed if supported by substantial evidence on the record as a whole, 29 U.S.C. § 660(a); *see Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and if in accordance with law, 5 U.S.C. § 706(2)(A); *see, e. g., Brennan v. Occupational Safety & Health Review Com'n,* 511 F.2d 1139 (9th Cir. 1975); *Brennan v. Occupational Safety & Health Review Com'n,* 502 F.2d 946 (3d Cir. 1974). The company's liability under both citations rests primarily on a theory imputing Chupp's knowledge and conduct to Horne.[4] A review of the Act, the deci-

---

**3.** Section 17(k), 29 U.S.C. § 666(j), provides: "For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment *unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.* (emphasis added)

**4.** We reject the Secretary's contention that Mr. Horne was individually liable, even absent any imputation. This assertion is based primarily on the fact that 4 × 4 and possibly some 4 × 6 upright timbers were provided for the shoring, rather than the 3 × 6 timbers required by 29 C.F.R. 652(b), Table P-2. The regulation provides that trenches of the type involved here shall be "shored, sheeted, braced, sloped or otherwise supported by *means of sufficient strength to protect the employees* working within them." (emphasis added). Table P-2

sets forth certain minimum shoring requirements.

The Commission recently addressed this issue in *Secretary v. Adams & Mulberry Corp.,* 3 BNA OSHC 1077 (OSHRC Docket No. 2548, April 25, 1975). In that case, as in the instant one, a cave-in occurred in the unshored portion of a trench, but the shored section held. The Secretary alleged, inter alia, that a violation was shown because different sized stringers than those required by Table P-2 were used. The Commission rejected this theory: The only expert testimony . . . was that the sheeting, when installed, was sufficient to prevent any kind of cave-in. We also note that the braced portion of sheeting did in fact hold. We therefore concluded that the braced portion of the trench was provided with "means of sufficient strength to protect the employees." As for Table P-2 it only purports to establish minimum shoring requirements. The Secretary, however, seems to argue that the Table establishes exclusive shoring requirements. His reading is contrary to the language of the standard and the title of the Table. . . . [T]he

sions of other circuits, and those of the Commission convinces us that this was error and amounted to the imposition of a strict liability standard, which the Act neither authorizes nor intends, and that it was therefore "not in accordance with law."[5]  5 U.S.C. § 706(2)(A).

■ The purpose and policy of the Occupational Safety and Health Act is "to assure *so far as possible* every working man and woman in the Nation safe and healthful working conditions  . . . ." 29 U.S.C. § 651 (emphasis added). To achieve that goal, the Act imposes on employers a general duty to provide "a place of employment  . . .  free from recognized hazards that are  . . likely to cause death or serious physical harm  . . .," and establishes a dual responsibility of employers and employees to "comply with occupational safety and health standards  . . . ." 29 U.S.C. § 654. Section 17(k) of the Act, which defines "serious" violations, precludes employer liability if "the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation."[6]  29 U.S.C. § 666(j).

Early cases construing the Act dealt with the general duty clause, but are also relevant to the question of congressional intent concerning the responsibilities of employers and employees under the specific duty clauses. In the leading case of *National Realty & Construction Co. v. Occupational Safety & Health Review Com'n*, 160 U.S.App.D.C. 133, 489 F.2d 1257 (1973), a company foreman had been killed while riding on the running board of a front-end loader, in violation of company policy. The court reversed the Commission's determination that the employer had violated the general duty clause, holding that the Secretary had failed to carry his burden of proof. Examining the employer's statutory duty to prevent hazardous conduct by employees, the court concluded:

> . . .  Congress quite clearly did not intend the general duty clause to impose strict liability: The duty was to be an achievable one.  . . .  A hazard consisting of conduct by employees, such as equipment riding, cannot  . . .  be totally eliminated. A  . . .  willfully reckless employee may on occasion circumvent the best conceived and most vigorously enforced safety regime.  . . .  Congress intended to require elimination only of preventable hazards.

*Id.* at 1265–66 (footnotes omitted).

The Seventh Circuit agreed with the D.C. Circuit's construction, and held that an employer was not guilty of a serious violation of the general duty clause when an inexperienced employee was killed while unloading a truck, after the employer had explicitly warned him to stay away from the trucks. *Brennan v. Occupational Safety & Health Review Com'n*, 501 F.2d 1196 (7th Cir. 1974). The issue, the court determined, was foreseeability under section 17(k), 29

---

minimum requirements of the Table were met as to the braced portion of the trench. *Id.* at 1078. *See also United States v. Dye Constr. Co.*, 510 F.2d 78, 81 (10th Cir. 1975) ("Clearly, the Tables are illustrative and are not capable of overriding the regulation . . . .").

Here, the uncontroverted evidence is that the cave-in began at the backhoe, continued down the trench for some 50 feet, and ceased at the very point at which the shoring began. The only expert testimony was that the material provided, if properly used, was sufficient. Thus, the conclusion is virtually inescapable that the shoring was "of sufficient strength to protect the employees  . . . ." We agree with the Commission's *Adams & Mulberry*

holding that the Table P-2 requirements are not exclusive. Consequently, on these facts there can be no liability based solely on the size of the timbers used.

5. Our holding renders unnecessary any discussion of petitioner Horne's challenge to the validity of the regulations. Its constitutional challenges to the Act have recently been rejected by this court. *Dan J. Sheehan Co. v. Occupational Safety & Health Review Com'n*, 520 F.2d 1036 (5th Cir. 1975); *Luke Butler Apparel Co. v. Secretary*, 519 F.2d 84 (5th Cir. 1975); *Atlas Roofing Co. v. Occupational Safety & Health Review Com'n*, 518 F.2d 990 (5th Cir. 1975).

6. *See* n.3, *supra.*

U.S.C. § 666(j); it concluded that a reasonably diligent employer could not have foreseen the danger. The Seventh Circuit recently elaborated on the foreseeability requirement of section 17(k): "In sum, whether a serious violation of the standard was foreseeable with the exercise of reasonable diligence depends in great part on whether [the] employees . . . had received adequate safety instructions." *Brennan v. Butler Lime & Cement Co.*, 520 F.2d 1011, 1018 (7th Cir. 1975) (specific duty case).

In the instant case, it is undisputed that Horne had an excellent safety program. A safety expert who had examined the company's program testified that it "far exceeds" that of similar companies, and the administrative law judge found on undisputed evidence that "Mr. Horne was diligent in providing for the safety of his employees. . . ." The record shows that Mr. Horne took virtually every conceivable precaution to ensure that his employees were aware of and understood the requirements of the Act and that they conducted themselves in accordance therewith. In fact, Mr. Horne's undisputed testimony shows that for many years prior to the passage of the Act, he had been actively engaged in efforts to provide safe working conditions; and that prior to the May 19 accident his company had an excellent record of almost twenty years without a lost-time accident. On the facts of this case, it is readily apparent that Mr. Horne did everything within his power to ensure compliance with the law, short of remaining at the job site and directing the operations himself. The question then becomes whether this final effort was required.

While the courts have emphasized the importance of adequate instruction and supervision in safety matters, they have consistently refused to require measures beyond those which are reasonable and feasible. In *National Realty, supra,* the court held that employee misconduct is not preventable "if its elimination would require methods of hiring, training, monitoring, or sanctioning workers which are either so untested or so expensive that safety experts would substantially concur in thinking the methods infeasible." 489 F.2d at 1266. The Third Circuit, in *Brennan v. Occupational Safety & Health Review Com'n*, 502 F.2d 946 (3d Cir. 1974), affirmed the Commission's holding that close supervision of an experienced employee, who violated the Act without his employer's knowledge, was not feasible.[7] The court quoted the following language from the Commission's decision:

> While close supervision may be required in some cases to avoid accidents, it is unrealistic to expect an experienced and well-qualified laboratory technician to be under constant scrutiny. Such a holding by the Commission, requiring that each employee be constantly watched by a supervisor, would be totally impractical and in all but the most unusual circumstances, an unnecessary burden.

*Id.* at 949. The employee in question had 21 years' experience, an accident-free record, and had never been observed to do anything unreliable or unsafe.

Both of the Horne employees killed in the accident were experienced foremen. Chupp had six journeyman plumber licenses, most of which he had held since 1951, and had been employed as a Horne foreman since 1965. Cox had been a licensed journeyman plumber since 1949; he had worked as a contractor, and, for three years, as a county plumbing inspector. He had been a foreman for Horne since 1964. Concerning the company's policy on shoring trenches, Mr. Horne testified in part as follows: ". . . [I]t had been my policy for years to send plywood sheeting to the job before there was a law. In other words, I have instructed them for years to use it. I've

---

7. There was in that case evidence in the record that another, feasible method for reducing the likelihood of employee disregard of recognized hazards was available and commonly used in the industry. The case was remanded for further proceedings on the question whether the employer could and should have utilized this practice.

owned jacks for years and instructed them to use them. And, of course, we always have a supply of shoring material and this shoring a ditch is just as—should be just as . . . second nature to them as using a wrench. I mean, in other words, it's not an uncommon thing; it's their business." The administrative law judge specifically found that "there was no dispute that his foreman understood his policy and instructions. It also appears that he had no reason to believe his policy and instructions would be disregarded by his foreman." On these facts, there was simply nothing more that Mr. Horne could have done to prevent the violation other than personally directing the operation himself. We find that this would be a wholly unnecessary, unreasonable, and infeasible requirement. The question remains whether, despite Mr. Horne's admittedly conscientious efforts to ensure compliance with the Act, he was properly held liable for his foremen's derelictions under the imputation theory employed by the judge and affirmed by the Commission.

■ The Ninth Circuit recently affirmed a Commission decision holding that employer knowledge is an element of proof of both serious violations under section 17(k) and non-serious violations, and that the burden is on the Secretary to prove the existence of that element, rather than on the respondent to prove its absence. *Brennan v. Occupational Safety & Health Com'n*, 511 F.2d 1139 (9th Cir. 1975). The employer had been charged with a number of both serious and non-serious violations that had "resulted from individual employee choices of conduct . . . which were contrary to the employer's instructions." *Id.* at 1140. The court found no evidence indicating that the employer, a small sawmill, had any knowledge of its employees' disobedience of its established instructions, and there had been no effort to prove that the instructions were a "mere sham" or that the employer regularly condoned their disregard. *Id.* at 1141. In the present case, of course, it was established that Horne had no personal knowledge of the violations, but Chupp's knowledge was proved and was imputed to Horne by the judge as a matter of law. Nevertheless, the Ninth Circuit's rationale for requiring the Secretary to prove employer knowledge, even of nonserious violations, is pertinent to the issue of the propriety of imputing responsibility to the employer:

The legislative history of the Act indicates an intent not to relieve the employer of the general responsibility of assuring compliance by his employees. Nothing in the Act, however, makes an employer an insurer or guarantor of employee compliance therewith at all times. The employer's duty, even that under the general duty clause, must be one which is achievable. . . . We fail to see wherein charging an employer with a nonserious violation because of an individual, single act of an employee, of which the employer had no knowledge and which was contrary to the employer's instructions, contributes to achievement of the cooperation sought by the Congress. Fundamental fairness would require that one charged with and penalized for violation be shown to have caused, or at least to have knowingly acquiesced in, that violation. Under our legal system, to date at least, no man is held accountable, or subject to fine, for the totally independent act of another. . . .

. . . Not requiring the Secretary to establish that an employer knew or should have known of the existence of an employee violation would in effect make the employer strictly and absolutely liable for *all* violations and would render meaningless the statutory requirement for employee compliance, 29 U.S.C. § 654(b).

To revive the citation . . . would be to subject an employer to a standard of strict liability, under the special duty clause, for deliberate employee misconduct. We do not find that result to be within the intent of the Congress.

*Id.* at 1144–45 (emphasis in original; footnote omitted). We adopt the reasoning of the Ninth Circuit and hold that, on the facts of this case, it was error to find Horne liable on an imputation theory for the unforeseeable, implausible, and therefore unpreventable acts of his employees. A contrary holding would not further the policies of the Act, and it would result in the imposition of a standard virtually indistinguishable from one of strict or absolute liability, which Congress, through section 17(k), specifically eschewed.

We note that the Commission has itself adopted virtually the same position in recent opinions. In *Secretary v. Engineers, Inc.*, 3 CCH Employment Safety & Health Guide ¶ 20,012 (Docket No. 3551, September 29, 1975), a company foreman-supervisor with seven years' excavation and supervisory experience had entered an unsafe trench, as a result of which the employer was charged with violation of the same shoring regulation involved here, 29 C.F.R. § 1926.652(b). The employee, Manning, knew that his action contravened the respondent's safety rules; it was the first time he had violated company instructions. The Commission reversed the administrative law judge, stating:

> In affirming the violation, the Judge held that the respondent was absolutely liable for the conduct of its agent, Manning, which was imputable to the respondent despite the fact that it was in contravention of the respondent's safety policy. The Judge erred, however, because the Act does not impose absolute liability upon employers when an employee fails to follow established safety practices. . . .
>
> .  .  .  .  .
>
> Since Congress intended to require elimination only of preventable hazards, an employer is not responsible for unpreventable instances of hazardous conduct by his employees. . .
>
> To hold respondent in violation under the circumstances presented by this record would disregard the Act's dual responsibility upon both employees and employers to comply with safety requirements. . . .
>
> Complainant has not shown what respondent could have done to prevent the idiosyncratic behavior of Manning. It was, so far as respondent was concerned, an unpreventable occurrence which could not be predicted.

*Id.* (footnotes omitted).

The Commission essentially reaffirmed this view in *Secretary v. Ocean Electric Corp.*, 3 CCH Employment Safety & Health Guide ¶ 20,167 (Docket No. 5811, November 21, 1975), where it stated:

> To hold employers to the absolute duty of guaranteeing compliance at all times by its supervisory personnel would . . . not tend to promote the achievement of safer workplaces. If employers are told that they are liable for violations regardless of the degree of their efforts to comply, it can only tend to discourage such efforts. . . . In our judgment, an employer who would otherwise be found in violation due to the actions and knowledge of a supervisor should be permitted to defend on the basis that it took all necessary precautions to prevent the occurrence of the violation.

*Id.* (footnotes omitted). *See Secretary v. Adams & Mulberry Corp.*, 3 BNA OSHC 1077, 1078 (Docket No. 2548, April 25, 1975) ("Certainly, in cases where noncompliance results because of factors beyond the control of the employer he should not be found in violation").

In summary, we conclude that it would be inconsistent with the purposes and policies of the Act and contrary to the express language of section 17(k) to penalize Horne for violations of which he had no knowledge, which he could not have foreseen, and which he had taken such elaborate measures to prevent. In the words of the Commission, the violations were "an unpreventable occurrence which could not be predicted." *Secretary v. Engineers, Inc., supra.* The decision and citation of the Commission is in all respect *vacated* and *set aside.*