**GETTY OIL COMPANY, Petitioner,**

**v.**

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and the United States Department of Labor, Respondents.**

**No. 75–1828.**

United States Court of Appeals, Fifth Circuit.

April 23, 1976.
Rehearing Denied June 16, 1976.

Jack L. Brandon, Houston, Tex., for petitioner.

William S. McLaughlin, Executive Sec., OSHRC, John T. Dunlop, Secretary of Labor, Robert K. Salvers, Jr., Michael H. Levin, U. S. Dept. of Labor, Washington, D. C., for respondents.

Before TUTTLE, GODBOLD and GEE, Circuit Judges.

TUTTLE, Circuit Judge:

This is a petition for review of an Order of the Occupational Safety and Health Review Commission issued against petitioner Getty Oil Company on March 17, 1975, finding Getty guilty of a serious violation of Section 5(a)(1) of the Occupational Safety and Health Act, and assessing a penalty of $550. Finding substantial evidence on the record as a whole to support the Commission's decision, we affirm its Order.

The facts surrounding the alleged violation are undisputed. Among its many interests, Getty owns and operates a gas and oil lease in Matagorda County, Texas. Located on this lease is a separation facility which gathers gas and oil from wells on the lease and transmits them to an outgoing pipeline at higher pressures. In late 1972 it became apparent to the company that the separation facility lacked the capacity to handle the level of fluids passing through the system. After studying the problem, Getty engineers decided to remedy it by installing a type of pressure vessel known as a fluid booster tank to step up the pressure in the lines. Getty's Area Engineer, Joseph King, designed the vessel and instructed one of the company's field mechanics, Robison, to have the vessel fabricated and pressure tested at a local welding shop. Throughout the course of discussing possible structural designs, King emphasized to Robison the necessity of pressure testing the vessel before placing it into operation.

On the morning of February 20, 1973 Robison went to the welding shop to pick up the vessel. The shop owner told Robison that the vessel had not yet been pressure tested but Robison simply shrugged his shoulders and left taking the vessel with him.

Some time that morning Robison telephoned King, by which conversation, according to the Findings of the Administrative Law Judge "Robison informed King he was on his way to put the vessel into service."[1] During this conversation King did not ask Robison whether it had actually been pressure tested either by the welding shop or by Robison himself.

By late that afternoon installation of the untested vessel had been completed. After a brief conversation with the lease operator and the production foreman, both Getty's employees and both of whom were present at the installation site, but neither of whom inquired of Robison as to whether the vessel had been tested, Robison proceeded to put the pressure vessel into operation by activating a valve. The pressure in the vessel increased from 300 to 930 pounds per square inch, and an explosion occurred, ripping the vessel loose and hurling it some forty-five feet. Gas and oil erupted from the vessel and ignited, fatally injuring Robison and severely burning the production foreman. The ensuing fire consumed one of the company's pickup trucks and was not extinguished until half an hour later.

The hearing conducted before the Administrative Law Judge established without dispute the facts that standard industry practice required the testing of pressure vessels before placing them into service, and that failure to conduct such tests is a recognized hazard in the oil-producing industry that would not only possibly, but probably, result in the kind of accident such as occurred in this case. As part of its defense, Getty put on evidence showing that Robison was a skilled worker with thirty years' previous experience with the company, and whose abilities and safety-consciousness were

---

1. The testimony by King is as follows:

"The morning of the accident, on February the 20th, Mr. Robison called me at my home and said that he was going to Palacios to put the unit in service, and he was in a hurry. And it was just a two sentence conversation. And he hung up, and that's the last word I had from him."

regarded by King and others as beyond question.

Based on the above facts, the Administrative Law Judge conducting the hearing found Getty guilty of a "serious violation" of Section 5(a)(1) of the Act, issued the company a citation for the violation, and assessed a fine of $550.[2] Getty unsuccessfully appealed the decision to the Occupational Safety and Health Review Commission, and now brings this action pursuant to the judicial review section of the Act, 29 U.S.C. § 660.

In considering petitioner's request to set aside the Commission's decision, we are bound by that body's findings on questions of fact if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 660(a). The section of the Act which Getty is charged with violating is the "general duty" clause requiring every employer to

"furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

■ To establish a violation of the general duty section, the Secretary must prove "(1) that the employer failed to render its workplace 'free' of a hazard which was (2) 'recognized' and (3) 'causing or likely to cause death or serious physical harm.'" *National Realty and Construction Co. v. OSHRC and Secretary,* 160 U.S.App.D.C. 133, 489 F.2d 1257, 1265 (1973). The section is intended neither to impose liability on the employer for an employee's negligence on a *respondeat superior* basis, nor to create a standard of absolute liability. The clause instead requires employers to discover and exclude from the workplace

"[a]ll [*feasibly*] *preventable* forms and instances of hazardous conduct," *id.* at 1267 & nn. 34–37 (emphasis added).

The uncontroverted evidence in the record shows that failure to pressure test a pressure vessel before activation is a universally-recognized hazard in the oil industry and that omitting such tests was likely to cause serious injury and created an extremely high probability of rupture and ensuing harm in the instant case. Thus, it is clear that the hazard at issue here was both "recognized" and likely to cause serious harm, as well as preventable by the simple expedient of pressure testing. Getty's recognition of this fact was thoroughly established by the fact that King had emphasized the need for testing.

■ Accordingly, the only issue before this Court is whether the Commission's determination that the Section 5(a)(1) violation which occurred was "serious" within the meaning of the Act is supported by substantial evidence. Under Section 17(k) of the Act, 29 U.S.C. § 666(j), Getty cannot be found guilty of a "serious" violation unless it did not, and could not "with the exercise of reasonable diligence," know of the presence of the violation. Since it is undisputed that the company did not have actual knowledge of the fact that the vessel had not been pressure tested, the sole remaining issue is whether Getty could have discovered this fact by "reasonable diligence."

Getty's sole defense both at the hearing and before this Court on appeal is its contention that the violation at issue was attributable solely to Robison, and that the company fully discharged its duties under the Act by instructing Robison on several different occasions to have the vessel pressure tested before putting it

---

2. The proposed penalty was calculated on the basis that the alleged violation was serious and resulted in grave consequences. Although an employee who is found guilty of a "serious" violation as defined by Section 17(k) of the Act can be fined up to $1,000, it is customary to make allowances, as was done in this case, for good faith and company size and history. 29 U.S.C. § 666(i). In approving the proposed penalty of $550, the Commission found that eight employees had been exposed to danger, that there was a strong possibility of death or injury upon failure to pressure test the vessel, and that Getty was committed to a program to assure a safe and healthful work environment, and had no previous history of violations of safety or health standards.

into operation. The company relies heavily on Robison's thirty years of experience with the company as a field mechanic, his reputation for being a responsible employee, and the undisputed fact that Robison had been repeatedly reminded by King of the necessity of pressure testing during the period when the vessel's design was being discussed and developed.[3] In light of these facts, it is unreasonable, Getty argues, to hold that an inquiry should have been made of Robison, on the very day the vessel was to be activated, as to whether the necessary testing had been performed.

The facts in the record, however, more than adequately support the Commission's finding that Getty could have discovered the hazard in this case with the exercise of "reasonable diligence." First, it was established at the administrative hearing that on the two previous occasions when Robison had been in charge of installing similar pressure vessels, Getty engineer King had actually ascertained prior to activation of the vessels that they had been pressure tested. That King had at least one opportunity to make a similar determination on the day the vessel was to have been placed into operation in this case is clear from the undisputed fact that Robison telephoned him the morning of the accident to notify him that the vessel would be installed that afternoon. The Commission's finding was based on the determination and reasoning of the Administrative Law Judge which included this language:

> "The violation in the instant case could not have occurred until *after* the vessel had been field fabricated. The time for the exercise of reasonable diligence *commenced with the employer's knowledge* that the fabrication had been completed. This knowledge was first acquired on the morning the day the vessel was placed into service *when Robison called the Area Engineer* and announced he was on his way

to make the installation. Then during the course of the installation the Production Foreman arrived on the scene several minutes before the explosion and ensuing fire. And the Lease Operator had been on and off the job site during that installation and had been there for some time before the event occurred. Thus, Respondent employer was provided with ample opportunity to make certain that the vessel was fit for the use intended *by the simple expediency of at least one of the three making inquiry of Robison that he had or had not conducted* or caused to be conducted *a pressure test* after its fabrication. . . .

The Administrative Law Judge did not make a finding that at the time of this call by Robison to King, Robison had already obtained the fabricated vessel. It is doubtful from the time and other circumstances of the call, that he had done so. However, the finding that the employer first acquired "knowledge that the fabrication had been completed on the morning the day the vessel was placed into service" is amply supported by the telephone call described by the ALJ as "when Robison called the Area Engineer (King) and announced he was on his way to make the installation." Obviously, King knew that the "fabrication had been completed" if Robison said "he was going to Palacious to put the unit into service." Being put on notice of the fact of completion, King had a clear chance of making inquiry of Robison whether he had or had not conducted *or caused to be conducted* a pressure test after its fabrication." (Findings of ALJ).

Furthermore, neither the lease operator nor the company production foreman who were on the site when Robison installed the vessel and one of whom was present when Robison was first admonished by King of the requirement of pressure testing took the opportunity to inquire of him as to whether the vessel had been pressure tested. In light of

---

**3.** We think the fact of repeated warnings by King of the need to pressure test the vessel is a circumstance upon which the Commission

could rely to support its finding rather than serving to weaken it.

the negligible effort that would have been required to determine whether the necessary testing had been performed, the high likelihood of serious injury in the absence of such testing, the company's knowledge thereof, as evidenced by King's repeated warnings, and the opportunities available to Getty to question Robison on the matter, we find that the Commission's determination that Getty failed to exercise "reasonable diligence" in this case is supported by substantial evidence.[4]

For the reasons stated above, the Commission's Decision and Order are AFFIRMED.

GEE, Circuit Judge (dissenting):

An employer is guilty of a serious violation of OSHA for which a penalty can be assessed only if it knew or through the exercise of reasonable diligence should have known of the violation, 29 U.S.C. § 666(j). In *Horne Plumbing and Heating Co. v. OSHRC,* 528 F.2d 564 (5th Cir. 1976), this court recently adopted the Ninth Circuit's requirement that employer knowledge be proved even for nonserious violations. *Brennan v. OSHRC,* 511 F.2d 1139, 1144–45 (9th Cir. 1975).[1] Since it is undisputed that the company did not have actual knowledge that the vessel was untested, the sole remaining issue is whether Getty could have discovered this safety violation with reasonable diligence.

The majority of the Commission agreed with the Administrative Law Judge's conclusion that "reasonable diligence would have required Getty to ask Robison prior to putting the fluid booster into operation whether or not it had been pressure-tested." Sometime on the morning of February 20, 1973, Robison telephoned his supervisor King to inform him that he was on his way to put the vessel into service.[2] A reading of the facts as stated indicates that the Administrative Law Judge believed Robison called King *after* he picked up the vessel and learned it had not been pressure tested by its fabricator:

> The time for the exercise of reasonable diligence commenced with the employer's knowledge that the fabrication had been completed. This knowledge was first acquired on the morning of the day the vessel was placed into service when Robison called the Area Engineer and announced he was on his way to make the installation.

The Commission, too, seemed to think that the morning telephone call, gave King a clear chance to inquire if the device had been pressure tested:

> When he picked up the fluid booster at the shop, Robison was informed that it had not been pressure tested as required by recognized industry safety practices. Although Robison informed King that he was about to install the device, King did not ask if the fluid booster *had been* pressure-tested. (Emphasis added).

If the Commission found that Getty could have discovered the hazard on the

---

4. The cases cited by Getty in its brief are all distinguishable because in each one the only person exposed to the danger was the actor, a single employee violating a safety rule of which he was well aware. In addition, in those cases the opportunity in a workplace was minuscule at best. *See, e. g.,* Standard Glass Co., Inc. CCH 1971–1973 OSHD ¶ 15,146 (June 26, 1972) (employee failed to wear a hard hat, in an isolated, brief instance); Clements Paper Co., CCH 1971–1973 OSHD ¶ 15,-128 (June 21, 1972) (employee killed when a heavy load he lifted contrary to instructions fell on him); Hanovia Lamp Division of Canrad Industries, CCH 197__–197__ OSHD ¶ 15,-355(    ) (employee killed while alone in his laboratory having failed to observe electrical safety rules of which he had been aware for 21 years).

1. Both *Brennan* and *Horne* applied this rationale to a special duty violation, but I see no reason for distinguishing the requirement when the violation involves the general duty to furnish a workplace free of recognized hazards.

2. The testimony of King at the administrative hearing:

> The morning of the accident on February the 20th, Mr. Robison called me at my home and said that he was going to Palacios to put the unit in service, and he was in a hurry.
>
> And it was just a two sentence conversation. And he hung up, and that's the last word I had from him.

Slaughter Lease with reasonable diligence because the early morning telephone call provided an opportunity to ask if the vessel had been tested, I find this conclusion unsupported by the evidence. The combination of the fact that Robison's call found King at home on the morning of a work day (February 20, 1973, was a Tuesday) and the fact that Robison said he was "going to Palacios," where the welding shop was located and the lease was not, strongly suggests that the call was *before* Robison's visit to the welder, where he learned of the failure to pressure test. In that event, Getty could not have learned from the call whether the vessel had been pressure tested in accordance with King's repeated instructions to Robison if at the time of the call Robison did not know this.

The majority recognizes this factual discrepancy but affirms the Commission anyway, suggesting that a question at the time of the early morning call might have persuaded Robison to make a test which he already knew he was to make. This holding imposes a continuous supervision rule on employers: given an experienced employee who knows what he is supposed to do, and given that he has been told to do so N times, then the number of times that he should have been told to do so is N + 1. I do not think that is what Congress meant to require by reasonable diligence. It would be imposing unreasonable diligence to require Getty to check to see if every order to a reliable employee had been complied with. In the words of Chairman Moran's dissent from the Commission's ruling:

> Requiring that respondent ask such an experienced employee if he did his job seems merely a way of holding this employer strictly liable for this reckless and unexpected act.

In *Horne Plumbing and Heating Co. v. OSHRC, supra,* this court refused to hold an employer liable for experienced employees' willful violations of safety instructions. I find Robison's failure to test the fluid booster just as "unforesee-able, implausible and therefore unpreventable" as the employees' violations in *Horne.* OSHA was adopted to encourage the cooperative efforts of employers and employees in maintaining safe working conditions. As we noted in *Horne,* "[i]f employers are told that they are liable for violations regardless of the degree of their efforts to comply, it can only tend to discourage such efforts." 528 F.2d, at 571, citing *Secretary v. Ocean Electric Corp.,* 3 CCH Employment Safety & Health Guide, ¶ 20,167 (Docket No. 5811, November 21, 1975) (footnotes omitted).

The majority tries to bolster its opinion with the make-weight argument that even without the last-chance phone call Getty could have learned of Robison's violation with negligible effort because the lease operator or the production foreman who were present at the installation site could have inquired if the fluid booster had been pressure tested. On the undisputed record, neither of these employees was Robison's supervisor or superior. Their duties ran in other lines, it being without dispute that Robison was a specialist who worked directly for the area superintendent, for whom King also worked. To require the lease operator and production foreman to double check on Robison would be similar to requiring a Chief Petty Officer to press an Air Force armorer about whether he had cleared all the guns on a visiting bomber. The Commission did not look to their failure to inquire about testing; it properly focused only on King's failure to check on Robison.

Congress never intended that whenever a serious accident happens the employer must be found to have known of any violation which caused it. Such a requirement would be punitive and, as we noted in *Horne* counter-productive. Moreover:

> Fundamental fairness would require that one charged with and penalized for violation be shown to have caused, or at least to have knowingly acquiesced in, that violation. Under our legal system, to date at least, no man

is held accountable, or subject to fine, for the totally independent act of another.

*Brennan v. OSHRC*, 511 F.2d 1139, 1145 (9th Cir. 1975). The Secretary has not met his burden of proof that Getty should have learned of this violation through the exercise of reasonable diligence. To impose liability for a violation without requiring such proof is to adopt a standard of strict liability which Congress specifically eschewed and which this circuit rejected in *Horne, supra.* The citation of the Commission should be vacated.