579 F.2d 378
 6 O.S.H. Cas.(BNA) 1693, 1978 O.S.H.D. (CCH) P 22,813
EMPIRE-DETROIT STEEL DIVISION, DETROIT STEEL CORPORATION, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray
Marshall, Secretary of Labor, United States
Department of Labor, Respondents.
 No. 76-1417.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 17, 1978.
Decided June 22, 1978.
 
 Hayes C. Stover, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for petitioner.
 William S. McLaughlin, Executive Secretary, Occupational Safety & Health Review Commission, Washington, D. C., U. S. Dept. of Labor, Washington, D. C., Michael H. Levin, Nancy L. Southard, Dept. of Justice, Washington, D. C., for respondents.
 Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and JOHNSTONE, District Judge.*
 PHILLIPS, Chief Judge.
 
 
 1
 This proceeding, before the court on petition to review, involves a $10,000 civil penalty imposed against petitioner, Detroit Steel Corporation, for willful violation of the general duty clause of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(1),[1] (hereinafter referred to as the Act.) The penalty is the maximum authorized for a willful violation of the general duty clause of the Act. 29 U.S.C. § 666(a).
 
 
 2
 The principal issue is whether petitioner was in willful violation of the general duty clause of the Act, as found by the administrative law judge. The Occupational Safety and Health Review Commission denied Detroit Steel's petition for discretionary review, and the decision of the administrative law judge became the final order of the Commission. 29 U.S.C. § 666(i). See Brennan v. OSHRC (Hanovia Lamp Division, Canred Precision Industries), 502 F.2d 946, 953 (3d Cir. 1974). Detroit Steel filed a petition to review pursuant to 29 U.S.C. § 666(a).
 
 
 3
 We affirm.
 
 I.
 
 4
 Petitioner owns and operates an open hearth steel making facility in New Boston, Ohio. Steel products produced at this facility are sold and shipped to eastern and midwestern states of the United States. Ranking 14th among the nation's steel producers with sales of approximately $110 million in 1974, petitioner employed an average of 1800 persons in that year.
 
 
 5
 From 1957 when petitioner began operations at the New Boston facility until the time of the present litigation, petitioner has operated five open hearth furnaces. These five furnaces operate in identical fashion, although furnace No. 5 is 30-50 tons larger than the other four. Forming a straight line across the front of the facility, these five furnaces are housed in a shed-like structure partially open to the air. The roof of the structure is approximately 150 feet high and covers an area approximately 200 yards long by about 50 yards wide. The furnaces are elevated above the open hearth pit area, an earthen area several hundred yards long and fifty or more yards wide at the rear of the open hearth furnaces. The open hearth pit area is the primary work area of the facility. In this area molten steel is "tapped", i. e., poured from the furnaces into ladles positioned on ladle stools below the furnace tap hole, and "teemed", i. e., poured from the ladles into ingots.
 
 
 6
 Iron, limestone and other materials are charged from a platform above the pit area through a door in the front of each furnace. As these materials heat to form molten steel, a residue of slag, i. e., impurities, remains on the surface of the steel. Slag constitutes between 15% And 20% Of the weight of the steel in the furnace. Before the steel is tapped from the rear of a furnace, a door in the front of the furnace is opened, thus permitting a large volume of slag to run out in front of the furnace. Slag separated from the steel at this juncture is known as front flush slag.
 
 
 7
 The furnace is tapped by means of an explosive charge at its rear. Placed under the tap hole, a trough carries the molten steel to the ladles positioned on ladle stools. After the steel has been tapped, slag which did not flow out of the furnace as front flush slag will run into the ladle and float on top of the metal in the ladle. Not infrequently, the slag running into the ladle will overflow the ladle. This slag is known as overflow slag. After the ladle has been tapped from the bottom of the ladle and the steel poured into ingots, approximately 40 tons of slag remain in the ladle. This slag, known as ladle slag, must be disposed of before the ladle can be re-used.
 
 
 8
 From 1957 until the mid-1960s, slag from all three sources (front flush, overflow and ladle slag) was disposed of by use of slag pots. An electric rail system brought a slag pot beneath a furnace to catch the front flush slag. Slag pots were also provided for overflow and ladle slag. After being filled with molten slag, the pots would be removed to the skullcracker, an area away from the open hearth pit, where the hardened slag was removed and the slag pots readied for re-use.
 
 
 9
 In 1956, the use of oxygen was introduced into the steel-making process resulting in cutting the time of a tapping cycle from twelve hours to six hours. Petitioner determined that the use of the slag pots was impractical and uneconomical. The administrative law judge found:
 
 
 10
 Their (the slag pots) use, in an oxygen, assisted open-hearth operation, resulted in "bottlenecking" production since there was no longer time for the filling and removal of the slag pots and their being cleaned, readied and returned for the next tap operation in the new six-hour cycle.
 
 
 11
 The slag pots were gradually eliminated so that by 1967 no pots were in use. In place of the slag pot, the front flush slag and overflow slag were permitted to fall upon the earthen floor of the open hearth pit. Also, ladle slag was dumped from the ladles onto the ground.
 
 
 12
 Regardless of which method of slag removal is used, some amounts of water are required in the open hearth pit area for cleaning and cooling ladles and washing down the rear of the furnace. The amounts of water were greatly increased, however, when the slag pots were discontinued and the dumping method employed, because the slag must be cooled sufficiently before bulldozers could remove the slag. Two water sprays under each furnace were used to cool the front flush slag. Water was also used to cool overflow and ladle slag. The quantity of water used and its method of application in cooling the slag were left to the judgment of an employee who is referred to as the "Water Boy."
 
 
 13
 In removing the slag from the work areas, bulldozers created pits and other depressions in the earthen floor. Excess water collected in these depressions, some pools of water covering areas 30 to 40 feet long, 10 to 15 feet wide and 11 inches deep. Additionally, water accumulated between furnaces in debris dumping holes up to four feet deep.
 
 
 14
 Beginning with petitioner's switch from using the slag pots to dumping the slag on the ground, numerous explosions occurred in the open hearth pit area by water entrapped by molten slag. If water is covered by molten slag, the water turns to steam which occupies 1600 times the volume of water. The extremely high pressure of trapped steam produces an explosion.
 
 
 15
 Occurring at least twice a week, these explosions in the main were caused by the dumping of hot ladle slag into puddles or pools of water. Petitioner's Assistant General Manager testified that approximately ten major explosions occurred between 1964 and 1975. An employee of petitioner testified that over a two and one-half year period, ten or twelve explosions occurred throwing hot slag 150 feet in the air to the top of the roof.
 
 
 16
 The hazard of explosions caused by molten slag coming into contact with water was a continuing topic of discussion between the union and petitioner. An employee who was chairman of the union's safety committee received, over a period of two years, approximately fourteen complaints from employees concerning the hazardous conditions. These conditions were also discussed by employees at safety meetings. The administrative law judge found that "little was done by (petitioner) to correct complaints concerning the presence of water."
 
 
 17
 In June 1972, water entrapped by molten slag caused an explosion, killing a bulldozer operator. This event precipitated an inspection by a compliance officer of the Secretary of Labor (hereinafter referred to as Secretary). The inspection resulted in a citation charging petitioner with a violation of the general duty clause of the Act, 29 U.S.C. § 654(a)(1), as well as violation of a specific standard, 29 C.F.R. § 1910.22(a)(2). This citation was not challenged by petitioner and thus became a final order of the Commission. 29 U.S.C. § 659(a). Petitioner's open hearth pit was again inspected by a compliance officer in October 1973. This inspection resulted in uncontested citations charging repeated violations of nine violations and failure to abate five other violations.
 
 
 18
 On September 3, 1974, two serious and violent explosions caused by dumping ladle slag onto the ground where water had accumulated caused injury to ten employees at petitioner's New Boston facility. The same compliance officer who had inspected petitioner's facility in June 1973, again inspected the facility in September 1974. Although petitioner informed the compliance officer of certain measures that were being taken to eliminate the hazard, the officer observed that the conditions he found in the open hearth pit area in June 1973 still existed in September 1974. Petitioner was issued a citation which alleged that on or about September 25, 1974, petitioner willfully violated § 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1) by:
 
 
 19
 (F)ailing to provide a place of employment free from recognized hazards that are causing or are likely to cause death or serious physical harm to its employees in that respondent failed to eliminate the hazards of explosions caused by the pouring or spilling of molten metal or slag onto the ground in areas where water can and has accumulated at the # 5 open-hearth furnace ladle stool . . . .[2]
 
 II.
 
 20
 Before reaching the issues involving the penalty, we deal first with petitioner's contention that the Secretary entered into a binding settlement agreement which should be enforced. The proposed agreement provided for reduction in the penalty from $10,000 to $7,500 and a reduction of the willful violation to a repeated violation. Petitioner authorized its counsel to stipulate to this agreement and in a telephone conversation with counsel for the Secretary, this proposed agreement was discussed, leaving counsel for the petitioner under the impression that the Secretary approved the settlement. The agreement was never reduced to writing. Counsel for petitioner claims that the Secretary entered into a binding agreement but subsequently "changed (his) mind."
 
 
 21
 The administrative law judge found that petitioner had failed to establish that the Secretary agreed to the proposed settlement. This determination is fully supported by the record. At the administrative hearing, counsel for the Secretary denied that the Secretary ever approved the proposed settlement. "An attorney's assertion of authority to compromise is not conclusive if later challenged by his client." Luis C. Forteza e Hijos Inc. v. Mills, 534 F.2d 415, 418 (1st Cir. 1976).
 
 
 22
 Even if it be assumed that petitioner introduced clear and convincing evidence of an oral compromise agreement that would have been binding between two private litigants, its contentions, if proved, would fall short of establishing a compromise agreement binding upon an agency of the United States Government. Generally, the Government is not bound by agreements of its agents acting beyond the scope of their authority. See Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 383, 68 S.Ct. 1, 92 L.Ed. 10 (1947); United States v. Stewart, 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40 (1940); Utah v. United States, 284 U.S. 534, 545, 52 S.Ct. 232, 76 L.Ed. 469 (1932); United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563 (1901); Taylor v. Perini, 503 F.2d 899, 901-02 (6th Cir.), Vacated on other grounds, 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1974); Cleveland Trust Co. v. United States, 421 F.2d 475, 482 (6th Cir.), Cert. denied, 400 U.S. 819, 91 S.Ct. 35, 27 L.Ed.2d 46 (1970); United States v. Rossi, 342 F.2d 505 (9th Cir. 1965); United States v. Willoughby, 250 F.2d 524, 530 (9th Cir. 1957); Wallace v. United States, 142 F.2d 240, 242-43 (2d Cir. 1944).
 
 
 23
 The Supreme Court said in Rock Island, Arkansas & Louisiana Railroad Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920), that "men must turn square corners when they deal with the Government." We are cited to no statute, regulation or other authority that would authorize an attorney for the Secretary of Labor to enter into a binding compromise by means of a telephone conversation, without formalizing the compromise by a written agreement.
 
 
 24
 This court on previous occasion has discussed the history and purpose of the Occupational Health and Safety Act of 1970. See Brennan v. Winters Battery Manufacturing Co., 531 F.2d 317, 323-24 (6th Cir. 1975), Cert. denied, 425 U.S. 991, 96 S.Ct. 2202, 48 L.Ed.2d 815 (1976). Furthermore, we note that 29 U.S.C. § 660(a) requires that "findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." See Dunlop v. Rockwell International, 540 F.2d 1283, 1287 (6th Cir. 1976). Substantial evidence was defined by this court in Jones v. Priebe, 489 F.2d 709, 710 (6th Cir. 1973), Quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938), as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moreover, adjudicatory conclusions of the Commission can be set aside only when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). See Brennan v. OSHRC (Hanovia Lamp Division, Canred Precision Industries), supra, 502 F.2d at 951.
 
 
 25
 Our initial inquiry is whether petitioner committed a violation of the general duty clause of the Act, 29 U.S.C. § 654(a)(1), on September 25, 1974.[3] To establish violation of the general duty clause, "the Secretary must prove (1) that the employer failed to render its workplace 'free' of a hazard which was (2) 'recognized' and (3) 'causing or likely to cause death or serious physical harm.' " National Realty & Construction Co. v. OSHRC, 160 U.S.App.D.C. 133, 141, 489 F.2d 1257, 1265 (1973). The Second and Fifth Circuits have also adopted the National Realty test. See Usery v. Marquette Cement Manufacturing Co., 568 F.2d 902, 909 (2d Cir. 1977); Getty Oil Co. v. OSHRC, 530 F.2d 1143, 1145 (5th Cir. 1976).
 
 
 26
 Petitioner does not dispute that water entrapped by molten slag is a hazard. Because petitioner admits knowledge of the dangerous potential of this condition, the hazard constitutes a "recognized hazard." See Usery v. Marquette Cement Manufacturing Co., supra, 568 F.2d at 910. See also Cape & Vineyard Division v. OSHRC, 512 F.2d 1148, 1152 (1st Cir. 1975); Brennan v. OSHRC (Vy Lactos Laboratories, Inc.), 494 F.2d 460, 463-64 (8th Cir. 1974). The third element of National Realty is established in that water entrapped by molten slag has killed one employee and seriously injured other employees of petitioner. See Usery v. Marquette Cement Manufacturing Co., supra, 568 F.2d at 910.
 
 
 27
 The duty imposed by the general duty clause of the Act must also be capable of achievement. See Brennan v. OSHRC (Hanovia Lamp Division, Canred Precision Industries), supra, 502 F.2d at 951. The purpose of the Act is " to assure So far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." 29 U.S.C. § 651(b) (emphasis added). See National Realty & Construction Co. v. OSHRC, supra, 160 U.S.App.D.C. at 142, 489 F.2d at 1266.
 
 
 28
 In the present case, alleviating the hazard of water entrapped by molten slag is clearly attainable. The administrative law judge found "that the slag pot method of slag removal is a feasible method and if re-instituted will result in the practical elimination of the hazard of explosion caused by water entrapped by molten slag on the open-hearth pit floor." Petitioner does not contest that the re-institution of slag pots is a feasible method of slag removal. An implemented safety program and procedures for dealing with water that is in the open hearth pit area will also aid in eliminating the hazardous condition.
 
 
 29
 Petitioner contends that no violation occurred on September 25, 1974, because the compliance inspector observed only Flush slag near pools of water, and that ladle slag, not flush slag, was the cause of the serious explosions. We find this argument unconvincing.
 
 
 30
 It is well settled that hazardous conduct need not actually have occurred to establish a violation of the general duty clause. See Brennan v. Smoke-Craft, Inc., 530 F.2d 843, 845 (9th Cir. 1976); Rea Express, Inc. v. Brennan, 495 F.2d 822, 825 (2d Cir. 1974); National Realty & Construction Co. v. OSHRC, supra, 160 U.S.App.D.C. at 143, 489 F.2d at 1267. The Eighth Circuit in Brennan v. OSHRC (Vy Lactos Laboratories, Inc.), supra, 494 F.2d at 463, stated: "A violation occurs whenever an employer fails to take reasonable precautionary steps to protect his employees from reasonably foreseeable 'recognized hazards' that are causing or Are likely to cause death or serious physical injury." (emphasis in original). In the present case we find that molten slag dumped on the earthen floor throughout the open hearth pit area in proximity to accumulations of water creates a recognized hazard.
 
 
 31
 Having found that petitioner violated the general duty clause, our next inquiry is whether the violation was willful. The definition of willful in the Act is not settled. In Frank Irey, Jr., Inc. v. OSHRC, 519 F.2d 1200, 1207 (3d Cir. 1974), Aff'd sub nom. on other grounds, Atlas Roofing Co. v. OSHRC, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the Third Circuit stated:
 
 
 32
 It is obvious from the size of the penalty which can be imposed for a "willful" infraction ten times that of a "serious" one that Congress meant to deal with a more flagrant type of conduct than that of a "serious" violation. Willfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act. Willful means more than merely voluntary action or omission it involves an element of obstinate refusal to comply.
 
 
 33
 Most circuits have adhered to the definition of willful as announced by the Fourth Circuit in Intercounty Construction Co. v. OSHRC, 522 F.2d 777, 779-80 (4th Cir. 1975), Cert. denied, 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976):
 
 
 34
 '(W)illful' means action taken knowledgeably by one subject to the statutory provisions in disregard of the action's legality. No showing of malicious intent is necessary. A conscious, intentional, deliberate, voluntary decision is described as willful, 'regardless of venial motive.' (citation omitted).
 
 
 35
 See United States v. Dye Construction Co., 510 F.2d 78, 81-82 (10th Cir. 1975); F. X. Messina Construction Corp. v. OSHRC, 505 F.2d 701, 702 (1st Cir. 1974).
 
 
 36
 In examining the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 Et seq., this court defined willfulness as follows:
 
 
 37
 The failure to comply with the safety standard under the Federal Coal Mine Health and Safety Act of 1969 is willful if done knowingly and purposely by a coal mine operator who, having a free will or choice, either intentionally disobeys the standard or recklessly disregards its requirements.
 
 
 38
 We do not consider the phrases "bad purpose" and "an evil motive" to be appropriate in this action. The Act, here involved, is a safety Act and it would be virtually impossible to establish violations if this rule were followed.
 
 
 39
 United States v. Consolidation Coal Co., 504 F.2d 1330, 1335 (6th Cir. 1974).
 
 
 40
 We agree with the above cited opinions of the First, Fourth and Tenth Circuits that a showing of evil or malicious intent is not necessary to establish willfulness in the context of 29 U.S.C. § 666. In the present case, the compliance officer in the September 25, 1974 inspection observed the identical hazardous conditions he had observed in the June 1973 inspection following the death of an employee caused by molten slag entrapping water. Although petitioner argues that one slag pot was in operation during some days in September 1974, and that this vitiates a finding of willfulness, the compliance officer did not see the pot in operation on the day he inspected petitioner's facility. In fact, the officer was told by petitioner's safety director and certain employees that the slag pots were not being used. Furthermore, it is clear that this one pot was not put back into even sporadic operation until immediately following the two explosions of September 3, 1974, which precipitated the present litigation.
 
 
 41
 Petitioner contends also that after the explosions of September 3 injuring ten employees, it agreed to cooperate with the union's proposed water control plan. The employer, not the employee, is responsible to provide a safe place in which to work. Quoting legislative history, the District of Columbia Court of Appeals remarked: "Final responsibility for compliance with the requirements of this act remains with the employer." National Realty & Construction Co. v. OSHRC, supra, 160 U.S.App.D.C. at 142, 489 F.2d at n. 36, Quoting S.Rep.No.91-1282, 91st Cong., 2d Sess. 10-11 (Oct. 6, 1970), Reprinted in (1970) U.S.Code Cong. & Ad.News 5177, 5187. The Seventh Circuit has stated: "Where an employee is directly participating in a job, the employer may well . . . have a duty under the Act to instruct him on the safe procedure for handling the job." Brennan v. OSHRC (Republic Creosoting Co.), 501 F.2d 1196, 1200 (7th Cir. 1974). See Rea Express, Inc. v. Brennan, supra, 495 F.2d at 825.
 
 
 42
 The death of an employee in June, 1973, caused by molten slag entrapping water put petitioner on notice of the hazardous condition of water in close proximity to molten slag. In Getty Oil Co. v. OSHRC, 530 F.2d 1143, 1146 (5th Cir. 1976), the court quoted with approval the following language of the administrative law judge: "The time for the exercise of reasonable diligence Commenced with the employer's knowledge (of the hazardous condition)." (emphasis in original).
 
 
 43
 From June, 1973, when a bulldozer operator was killed by an explosion, until September, 1974, when two explosions injured ten employees, petitioner took no action to remedy a known and recognized hazardous condition. We find no merit in petitioner's assertions that the sporadic reinstitution of one slag pot and petitioner's agreement to cooperate in a water control program counter a finding of willful violation of the general duty clause on the day of the inspection.[4] The administrative law judge found that the identical hazardous conditions existed on both the compliance officer's 1973 and 1974 inspections. This finding is supported by substantial evidence in the record. 29 U.S.C. § 660(a).
 
 
 44
 The decision of the Commission is affirmed. No costs are taxed. Each party will bear its own costs in this case.
 
 
 
 *
 Honorable Edward H. Johnstone, Judge, United States District Court for the Western District of Kentucky, sitting by designation
 
 
 [1]
 S 654. Duties of employers and employees
 (a) Each employer
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees. . . .
 
 
 [2]
 Other allegations contained in the citation were dismissed by the administrative law judge and are not a part of this proceeding
 
 
 [3]
 See generally Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988 (1973)
 
 
 [4]
 See (1970) U.S.Code Cong. & Admin.News, pp. 5177, 5190, wherein it is stated:
 It should be made clear that the language of Section 9 (29 U.S.C. § 658) does not limit the issuance of citations to those violations which the inspector has himself witnessed. It is the committee's intent that if an investigation should disclose that violations have occurred, even though since corrected, a citation may be issued in appropriate cases.
 See also Secretary of Labor v. Dic-Underhill, A Joint Venture, 5 O.S.H.C. 1251 (BNA) (1977).