593 F.2d 715
 7 O.S.H. Cas.(BNA) 1075, 1979 O.S.H.D. (CCH) P 23,334
Ray MARSHALL, Secretary of Labor, Appellant,
v.
WHIRLPOOL CORPORATION and Empire-Detroit Steel Division,
Detroit Steel Corporation, Appellees.
WHIRLPOOL CORPORATION, Cross-Appellant,
v.
Ray MARSHALL, Secretary of Labor, Cross-Appellee.
 Nos. 76-2143, 76-2144 and 76-2261.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 21, 1978.
Decided Feb. 22, 1979.
As Amended on Denial of Rehearing and Rehearing En Banc April 4, 1979.
 
 E. Thomas Maguire, Robison, Curphey & O'Connell, Toledo, Ohio, Robert E. Mann, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for appellees in No. 76-2143 and cross-appellant in No. 76-2144.
 George Cohen, Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., for amicus Industrial Union.
 Dennis K. Kade (argued), Michael H. Levin, Thomas L. Holzman, William J. Kilberg, Benjamin W. Mintz, U. S. Dept. of Labor, Washington, D. C., for appellant in Nos. 76-2143, 76-2261 and cross-appellee in No. 76-2144.
 Michael A. Fulton, Beirne & Wirthlin, Cincinnati, Ohio, for appellee in No. 76-2261.
 Before EDWARDS, Chief Judge and KEITH and MERRITT, Circuit Judges.
 DAMON J. KEITH, Circuit Judge.
 
 
 1
 This case presents a legal question of great significance to American workers and their employers: Whether under the Occupational Safety & Health Act of 1970, 29 U.S.C. §§ 651 Et seq., the Secretary of Labor may limit the right of an employer to discipline or discharge an employee who refuses to work in the good faith belief that to do so would subject him to danger.
 
 
 2
 In a carefully circumscribed regulation,[1] the Secretary of Labor (Secretary) has interpreted the Occupational Safety and Health Act's retaliatory discharge provision[2] as protecting an employee who withdraws from danger on the job under certain conditions: The employee's fear must be objectively reasonable, the employee must have sought correction of the dangerous condition and resort to normal OSHA enforcement procedures must be inadequate. Two district courts below ruled that this regulation is invalid because it has no statutory support and because OSHA's legislative history reveals Congressional intent at odds with the regulation. The district courts have sanctioned an employer's right to make workers choose between their jobs and their lives.
 
 
 3
 We cannot agree that the statute was ever intended to require placing an employee in such an untenable position. Since we find that the Secretary's regulation is consistent with the stated purposes of the Act and its legislative history, and that it represents an appropriate employment of the regulatory power conferred upon the Secretary by the statute, we reverse a ruling to the contrary entered without trial by one District Judge, and remand for further proceedings. As to the other appeal, where the District Judge, after evidentiary hearing, found violation of the regulation but denied relief because of his belief that the regulation was invalid, we also reverse and remand for appropriate remedy.
 
 FACTS
 The regulation in question here provides:
 
 4
 S 1977.12 Exercise of any right afforded by the Act
 
 
 5
 (a) In addition to protecting employees who file complaints, institute proceedings, or testify in proceedings under or related to the Act, section 11(c) also protects employees from discrimination occurring because of the exercise "of any right afforded by this Act." Certain rights are explicitly provided in the Act; for example, there is a right to participate as a party in enforcement proceedings (sec. 10). Certain other rights exist by necessary implication. For example, employees may request information from the Occupational Safety and Health Administration; such requests would constitute the exercise of a right afforded by the Act. Likewise, employees interviewed by agents of the Secretary in the course of inspections or investigations could not subsequently be discriminated against because of their cooperation.
 
 
 6
 (b)(1) On the other hand, review of the Act and examination of the legislative history discloses that, as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace. Hazardous conditions which may be violative of the Act will ordinarily be corrected by the employer, once brought to his attention. If corrections are not accomplished, or if there is dispute about the existence of a hazard, the employee will normally have opportunity to request inspection of the workplace pursuant to section 8(f) of the Act, or to seek the assistance of other public agencies which have responsibility in the field of safety and health. Under such circumstances, therefore, an employer would not ordinarily be in violation of section 11(c) by taking action to discipline an employee for refusing to perform normal job activities because of alleged safety or health hazards.
 
 
 7
 (2) However, occasions might arise when an employee is confronted with a choice between not performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the dangerous condition, he would be protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition.
 
 
 8
 Pursuant to 29 U.S.C. § 660(c)(2)[3] the Secretary, on behalf of three workers, separately sued defendants Detroit Steel Corporation and Whirlpool Corporation in federal district court for wrongfully retaliating against the workers' exercise of "(a) right afforded by (the Act)", 29 U.S.C. § 660(c)(1) namely, the right conferred by the regulation, Supra to withdraw from the risk of serious danger on the job.
 
 
 9
 In No. 76-2262, Marshall v. Detroit Steel Corp., the district court dismissed the Secretary's complaint, ruling that it failed to state a claim upon which relief could be granted. For purposes of this appeal, we must assume that the allegations in the complaint are true and that Detroit Steel violated the regulation. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Thus, we are directly faced with the pure issue of whether the Secretary's regulation is valid. In No. 76-2143, Marshall v. Whirlpool Corp.,[4] the district court also found the regulation to be invalid but only after conducting an evidentiary hearing and concluding that the Secretary's complaint was factually correct: the regulation had been violated. An examination of the facts in that case[5] illustrates that this issue is no mere academic exercise, but literally one of life and death.
 
 
 10
 The Whirlpool Corporation maintains a manufacturing plant at Marion, Ohio where it produces household appliances. The Marion plant has 13 miles of overhead conveyors which transport appliance components throughout the plant. In order to prevent injury should an appliance component fall from one of the overhead conveyors, the Company installed a huge guard screen approximately 20 feet above the plant floor. The guard screen is suspended over one-third of the total plant floor area. As part of their regular duties, maintenance employees must remove fallen parts from the screens and replace paper spread on the screen to catch grease drippings. In addition the overhead conveyors occasionally need maintenance. In order to perform their duties, maintenance workers must step onto the steel mesh screen itself.
 
 
 11
 The original steel mesh used 16 gauge panels although starting in 1973 the company began to replace these panels with heavier mesh which could better withstand the stresses imposed upon it. The questionable safety of the 16-gauge screens is demonstrated by several incidents where workers fell partly through them and at least one incident where a worker fell to the plant floor below but survived. A number of maintenance employees reacted to these "near-misses" by frequently bringing the unsafe screen conditions to the attention of their foremen. Their complaints were to no avail, and on June 28, 1974, a maintenance employee fell to his death through the guard screen in a section where stronger wire mesh had not yet been installed.[6] Although Whirlpool did respond to the fatality by issuing a general order directing maintenance employees to clean guard screens without walking on them and to effectuate some repairs where the screens were weak, two employees who regularly worked on the screens pointed out that many hazardous areas remained. When the company did not respond to their fears regarding these areas, the two employees asked the company safety director to provide them with the local OSHA area office's phone number. The "safety director" gave them the number but made veiled threats that the men should watch what they were doing and took their names and clock numbers.
 
 
 12
 The night following this incident the two men punched in on their shift and awaited their assignments. They were ordered onto the screens to do their maintenance work. When the men refused, citing the company safety directive saying such work should be done without stepping on the screens, they were peremptorily ordered to the company personnel office, disciplined and issued written reprimands for insubordination.
 
 
 13
 * Congress provided in the 1970 Act for measures intended to correct unsafe work place conditions Before any job refusal over danger or employer retaliatory discipline took place. Under the statute an OSHA inspector issues a citation, followed by mailed notice of proposed penalty. 29 U.S.C. § 659(a). The employer has 15 days in which to contest the penalty. 29 U.S.C. § 659(b). Administrative proceedings are the responsibility of the Occupational Safety & Health Review Commission. 29 U.S.C. § 659(c). See 29 U.S.C. § 661. Judicial Review is available in the courts of appeal. 29 U.S.C. § 660.
 
 
 14
 The Act also provides for special procedures which can be taken when an employee fears that an "imminent danger" exists at the workplace. An employee who fears imminent danger to himself or to fellow employees must notify the Secretary of the danger. If the Secretary is satisfied that the complaint provides reasonable basis to believe that imminent danger exists, an OSHA inspector may enter the workplace. 29 U.S.C. § 657(f)(1). The inspector can cite the employer for a violation, the normal procedure under the Act, 29 U.S.C. § 657(a); if the inspector finds no violation, he must so notify the employees in writing. 29 U.S.C. § 657(f)(1). If the OSHA inspector believes, however, that there exists imminent danger of death or serious physical harm and that the normal enforcement channels, are inadequate, the OSHA inspector must recommend to the Secretary that immediate injunctive relief against the dangerous practices or conditions be sought in an applicable federal court. 29 U.S.C. § 662(a), (b), (c). Employees have the right to petition a federal district court for a writ of mandamus against the Secretary if he wrongfully fails to seek injunctive relief. 29 U.S.C. § 662(d).
 
 
 15
 The lengthy procedure under the statute, then, requires that the Secretary respond to worker's notice, that the OSHA inspector conclude that the danger cannot be prevented through normal enforcement procedures, that the Secretary agree with the inspector's conclusion, and that the federal district court agree to issue the injunction.
 
 
 16
 Although the Act is designed to protect workers, their role in enforcing the Act is indirect. Employees have the right to complain to the Secretary about hazardous conditions, and to provide information to the inspector during the investigation. 29 U.S.C. §§ 657(e), (f)(2).
 
 
 17
 In addition, a worker can petition a federal court for mandamus[7] to order the Secretary to seek an injunction should he decline to do so on recommendation of the inspector. Any retaliation against an employee for exercising these or other statutory right is proscribed by 29 U.S.C. § 660(c) (1). As the Secretary notes in the regulation, there exists no general right to refuse work; even when faced with hazardous conditions, one must complain to the Secretary and wait for the OSHA inspector to arrive.
 
 
 18
 What does the employee do while waiting for the OSHA inspector to arrive? Or what if an inspector is unavailable? For example, in Whirlpool, the disciplining of the employees who refused to work out of fear for their lives took place at 11:00 at night. Under the Secretary's regulation the question as to whether an OSHA inspector was readily available at that hour would become an issue of fact for the District Judge. Where an employee reasonably fears that he is in imminent danger and alternative relief is unavailable, the regulation allows him to refuse to perform that hazardous work and provides a subsequent due process remedy if there is retaliation from the employer. We must examine whether this regulation can be properly implied from the Act.
 
 II
 
 19
 Our question is whether the legislative history of this Act, its stated purposes and its allocation to the Secretary of power to implement its purposes by regulation serve to validate the regulation quoted above.
 
 
 20
 The statute itself spells out its purposes:
 
 
 21
 S 651. Congressional statement of findings and declaration of purpose and policy
 
 
 22
 (a) The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments.
 
 
 23
 (b) The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources
 
 
 24
 (1) by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions;
 
 
 25
 (2) by providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions;
 
 
 26
 (3) by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce, and by creating an Occupational Safety and Health Review Commission for carrying out adjudicatory function under this chapter;
 
 
 27
 The statute itself delegates broad power to adopt regulations to implement the purposes of the Act:
 
 
 28
 (2) The Secretary and the Secretary of Health, Education, and Welfare shall each prescribe such rules and regulations as he may deem necessary to carry out their responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment.
 
 
 29
 29 U.S.C. § 657(g)(2).
 
 
 30
 The statute itself prohibits employee discharge or discrimination for the exercise of "any right afforded by this chapter":
 
 
 31
 Discharge or discrimination against employee for exercise of rights under this chapter; prohibition; procedure for relief
 
 
 32
 (c)(1) No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.
 
 
 33
 29 U.S.C. § 660(c)(1) (1976).
 
 
 34
 We conclude that the regulation is a reasonable exercise of the Secretary's authority. As a rule, administrative regulations properly promulgated under statutory authority are presumed valid, Grubbs v. Butz,169 U.S.App.D.C. 82, 514 F.2d 1323 (1975); United States v. Boyd, 491 F.2d 1163 (9th Cir. 1973). An administrative officer exercising rule making powers delegated to him by Congress may adopt regulations so long as they are reasonable and consistent with the intention of Congress as expressed by the statute. See United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); Manhattan General Equipment Co. v. CIR, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). This deference which we must give to the Secretary's regulations is such that "we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) Quoting Unemployment Commission v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1924).
 
 
 35
 Under Lilly v. Grand Trunk Ry. Co., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943), it has been axiomatic in federal practice that a statute which is remedial, intended to protect worker safety, must be given a liberal construction."Since the Act in question is a remedial and safety statute, with its primary concern being the preservation of human life, it is the type of enactment as to which a 'narrow or limited construction is to be eschewed.' St. Marys Sewer Pipe Co. v. Director of United States Bureau of Mines, 262 F.2d 378, 381 (3d Cir. 1959). Rather, this court must interpret the Act liberally in light of its primary purpose."
 
 
 36
 Rushton Mining Co. v. Morton, 520 F.2d 716, 720 (3d Cir. 1975), Citing Freeman Coal Mining Co. v. Interior Bd. of Mine Op. Appeals, 504 F.2d 741, 744 (7th Cir. 1974). See also Swinson v. Chicago, St. Paul, M. & O. Ry., 294 U.S. 529, 55 S.Ct. 517, 79 L.Ed. 1041 (1935). Cf. United States v. American Trucking Assns., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (Statutes are to be construed to effectuate Congress' intent).
 
 
 37
 One need look no further than the Occupational Safety and Health Act's Statement of Purpose, 29 U.S.C. § 651(b), to find the strong remedial basis of this legislation. It is:
 
 
 38
 "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions And to preserve our human resources " (emphasis added).
 
 
 39
 Furthermore, under the Act every employer must "furnish to each of his employees, employment and a place of employment which are free from recognized hazards that are causing, or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654. This clause imposed a duty upon employers to furnish a workplace free from recognized deadly hazards.[8] See Empire Detroit Steel v. O. S. H. R. C., 579 F.2d 378 (6th Cir. 1978); Brennan v. Winters Battery Manuf. Co., 531 F.2d 317 (6th Cir. 1975), Cert. denied, 425 U.S. 991, 96 S.Ct. 2202, 48 L.Ed.2d 815 (1976).
 
 
 40
 That the Act is remedial and has thus been broadly construed by the courts[9] is of great relevance to this inquiry. 29 U.S.C. § 660(c)(1)'s requirement that employers not retaliate against complaining employees should be read broadly, otherwise the Act would be gutted by employer intimidation. Congress was aware of the shortage of federal and state occupational safety inspectors, and placed great reliance on employee assistance in enforcing the Act.[10] Furthermore, it is clear that without employee cooperation, even an army of inspectors could not keep America's work places safe.
 
 
 41
 Safety and profit are sometimes mutually exclusive. See Godwin v. OSHRC, 540 F.2d 1013, 1016 (9th Cir. 1976). In the words of the D.C. Circuit: "Safety costs money. The temptation to minimize compliance with safety regulations and thus shave costs is always present." Phillips v. Interior Bd. of Mine Operations Appeals, 163 U.S.App.D.C. 104, 110, 500 F.2d 722, 778 (1974), Cert. denied, 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975).[11]
 
 
 42
 Further, to invalidate the regulation would lead to absurd results. Consider the following cases:
 
 
 43
 1) Employee is faced with imminent hazard on the job. He leaves the job to telephone the local OSHA office and request an immediate inspection. The employer cannot lawfully discharge the employee.
 
 
 44
 2) Employee is faced with an imminent hazard on the job. He goes to a telephone, but is unable to reach an OSHA inspector, (or there is no telephone available). The worker goes to his car and personally locates an inspector. The worker and the inspector return to the job site. The employer cannot lawfully discharge the employee.
 
 
 45
 3) Employee is faced with an imminent hazard on the job. He telephones an OSHA inspector, but refuses to subject himself to the perceived hazard until the inspector arrives. Apparently, the employer is free to discharge the employee.
 
 
 46
 4) Employee is faced with an imminent hazard on the job. He is unable to reach an OSHA inspector by telephone, and has no automobile available to personally look for one (or nearest OSHA inspector is 100 miles away). Instead of conducting a futile quest on foot, the employee resolves to withdraw from the danger and try to locate an inspector later. Apparently, the employer is free to discharge the employee.
 
 
 47
 These illustrations demonstrate the reason for the Secretary's regulation. The knowledgeable employee who withdraws from the imminent job hazard and immediately take steps to locate an inspector is protected from retaliation. Yet, absent the regulation's protection, the employee who withdraws from the danger but reasonably waits, or must wait, to summon an inspector or for one to arrive, can be fired without recourse no matter what hazard he faced. The outcome should not hinge on whether an employee knows enough to keep within OSHA's protections by making obvious efforts to find an OSHA inspector immediately.
 
 
 48
 In sum, the need to give broad construction to a retaliatory discharge prohibition clause such as § 660(c)(1) is apparent. To do otherwise is to lay a trap for the unwary employee and to strip the employee of vital protection under a statute meant to safeguard him. We should not construe the Act to permit an employer to, in effect, chain a worker to his post under dangerous conditions until the Secretary can take action. To allow this to happen is to allow disastrous results to both employees and employers.
 
 
 49
 It is significant that other remedial acts passed by Congress contain similar provisions protecting employees against retaliation. These include: The National Labor Relations Act,[12] the Coal Mine Safety and Health Act,[13] Title VII of the Civil Rights Act of 1964,[14] and the Fair Labor Standards Act.[15]
 
 
 50
 These provisions have been given a liberal construction by the courts. In NLRB v. Scrivener, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972), the Court held that workers who give written sworn statements to NLRB field officers were protected under the NLRA although the statute[16] spoke only of protection for filing charges or giving testimony. The statute prohibited employers from "otherwise" discriminating against the exercise of a protected right. This language, coupled with the Act's remedial purpose was sufficient for the Court to grant protection.[17] Similarly, in Smith v. Columbus Metropolitan Housing Authority, 433 F.Supp. 61 (S.D.Ohio 1977), Judge Duncan broadly construed Title VII's retaliatory conduct prohibitions broadly to protect an otherwise uninvolved employee who refused to cooperate with an employer who was defending discrimination charges filed by discharged Black workers. See also Rutherford v. American Bank of Commerce, 565 F.2d 1162 (10th Cir. 1977); EEOC v. Kallir, 401 F.Supp. 66 (S.D.N.Y.1975). In Dunlop v. Carriage Carpet Co., 548 F.2d 139 (6th Cir. 1977), this court broadly construed the Fair Labor Standards Act to protect a Former employee from retaliation, although the statute, on its face, protected only employees. Judge Phillips' opinion for the court concluded with a statement which is equally applicable here:
 
 
 51
 To hold otherwise would do violence to the Congressional intent and purposes of the Act and would prejudice the effective enforcement of the Act.
 
 
 52
 Id. at 147.
 
 
 53
 Especially analogous is judicial construction of the Coal Mine Health & Safety Act of 1970. In Phillips v. Interior Board of Mine Operations Appeals, 163 U.S.App.D.C. 104, 500 F.2d 772 (1974), Cert. denied, 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975), the court construed that Act to protect an employee who had complained about safety violations to his foreman and was fired for refusing to work under hazardous circumstances. The court reasoned that the employee's conduct was an implied initial step in the complaint process, deserving of protection.[18] The Act's language at the time was similar to OSHA's provision here.[19] See also Munsey v. Morton, 165 U.S.App.D.C. 379, 507 F.2d 1202 (1974) (remanding to Interior Board of Mine Operations Appeals for reconsideration in light of Phillips ).
 
 
 54
 When Congress passed the Federal Mine Safety and Health Amendments of 1977, 30 U.S.C. §§ 801 Et seq. it amended the statute's retaliatory discharge provisions.[20] The Senate Report stated that it was Congress' wish "to insure the continuing vitality of the various judicial interpretations of (the retaliatory discharge provision) of the Coal Act which are consistent with the broad protection of the bill's provisions . . ." S.Rep.No.91-181, 95th Cong., 1st Sess. 36 (1977), Reprinted in 1977 U.S.Code Cong. & Admin.News, pp. 3401, 3436. The two cases specifically cited with approval by the Committee were Phillips And Munsey. Id.
 
 
 55
 We note that OSHA specifically protects an employee's exercise of "any right afforded by this (Act)." A right to a hazard-free work place is implicit throughout the act, and specifically contained in the Act's statement of purpose, Supra. It is of some significance that the other statutes referred to, Supra, contain no similar broad language.[21] The above precedents compel that we broadly construe "any right" to include the right to refuse to work in the face of deadly peril under the circumstances outlined in the Secretary's regulation.
 
 
 56
 We would be free on our own to reach the result of permitting an employee to withdraw from danger, as did the D.C.Circuit in Phillips v. Interior Bd. of Mine Operations Appeals, supra. Indeed, the situation here is analogous to that in a series of cases which imply civil causes of action from statutes which otherwise do not provide for a specific civil remedy.[22] Here, however, all that we must do is pay traditional deference to the Secretary's rule-making authority. We have no difficulty doing so.
 
 
 57
 The Secretary has promulgated a regulation which is in no way inconsistent with the Act's purposes or the statutory scheme. On the contrary, as indicated above, the regulation performs a vital function in rounding out the Act's enforcement provisions. In sum, other things being equal, this regulation must be upheld in light of the deference given administrative interpretations of statutes, the broad reading traditionally given remedial statutes and the broad policy factors which underlie the regulation.[23]
 
 III
 
 58
 Defendants, however, argue that all things are not equal, because the legislative history is clear that Congress did not mean to extend to employees the rights given to them by the regulation. It is to this question that we must now turn.
 
 
 59
 The district courts below ruled, and the corporate defendants maintain, that the Act's legislative history evidences clear intent by Congress that employees not be allowed to walk off the job when faced with a dangerous situation. It is undisputed that the regulation which the Secretary has enacted was never directly addressed by Congress. The critical issue to be discussed, therefore, is whether we can infer from the Occupational Safety and Health Act's legislative history a specific Congressional will which is irreconcilable with the Secretary's regulation here.
 
 
 60
 Defendants seek to make this showing by pointing to two events which took place while Congress was considering the Act: 1) Congressional rejection of an ill-fated House bill which would have allowed employees subject to certain toxic substances on the job to withdraw and still be paid; 2) Congressional rejection of administrative shut down proposals. Defendants state that these events amount to an implicit declaration by Congress that the regulation in question cannot stand.
 
 
 61
 We begin our study of the legislative history of the Occupational Safety and Health Act with the so-called Daniels Bill, H.R. 16785 (1970),[24] which was reported out of the House Education and Labor Committee. The Daniels Bill contained a subsection, 19(a)(5), which allowed employees to absent themselves from their job, with pay, when exposed to substances which had a potentially toxic or harmful effect when found or used at certain levels in the work place, unless their employer provided appropriate warning labels and protective equipment which allowed them to carry out their work without being harmed.[25] Opponents of the Bill attacked this subsection as guaranteeing workers the right to "strike with pay," a label which proved to be its downfall. Unhappy with this and other provisions in the Daniels Bill, Congressman Steiger of Wisconsin introduced a substitute bill on the floor of the House which Inter alia did not contain a "strike with pay" provision. See H.R. 19200 (1970), Reprinted in Legislative History at 763.
 
 
 62
 Confronted with strong opposition on a variety of grounds,[26] Congressman Daniels responded, Inter alia, by offering to delete his bill's alleged "strike with pay" provision and offering to substitute a provision giving employees the right to request that the Secretary immediately inspect the premises.[27] He explained:
 
 
 63
 The provision on employees not losing pay was so generally misunderstood that we have decided to drop it. We have no provision for payment of employees who want to absent themselves from risk or harm; instead, we have this amendment which enables employees subject to a risk of harm to get the Secretary into the situation quickly. Instead of making provisions for employees when their employer is not providing a safe workplace, we have strengthened the enforcement by this amendment provision to try and minimize the amount that employees will be subject to the risk of harm.
 
 
 64
 116 Cong. Record, 38377-78 (1970), Reprinted in Legislative History at 1009. See also 116 Congressional Record 38369 (1970), Reprinted in Legislative History at 986 (Congressman Perkins); 116 Congressional Record 38376 (1970), Reprinted in Legislative History at 1005 (Congressman Daniels).
 
 
 65
 Notwithstanding Representative Daniels' efforts to make his bill more palatable,[28] the House voted it down[29] and instead passed the alternative Steiger bill. That bill said nothing about employees walking off the job, but allowed the Secretary to obtain temporary restraining orders from a Federal Court to enjoin imminent dangers in a workplace. If the Secretary unreasonably failed to seek this relief, an employee who was injured as a result could sue the United States in the Court of Claims.[30]
 
 
 66
 Action in the Senate began with the reporting out of Committee of the Williams Occupational Safety and Health Bill.[31] The Williams Bill did not contain a "strike with pay" provision. However, it did provide that in imminent danger situations, an employee had the right to make a written request for an immediate inspection.[32] Although the Williams bill had some controversial provisions,[33] it survived intact and passed the Senate.
 
 
 67
 In House-Senate Conference, the Senate was largely successful in retaining the provisions of the Williams bill. In particular, the Senate's provision, giving employees the additional right to contact the Secretary and to get an inspector on the scene at once was acceded to by the House.[34] Conference Report No. 91-1765, Reprinted in Legislative History at 1154, 1164-65; 1190-1191 and Reprinted in 1970 U.S.Code Cong. & Admin.News, pp. 5228, 5334. The Act as finally adopted incorporates this compromise. 29 U.S.C. § 657(f).
 
 
 68
 Defendants would have us characterize this series of events as indicating a specific determination by Congress that employees did not have the right to walk out, but instead had only the right to bring the Secretary on the scene to investigate an allegedly imminently hazardous situation. We disagree. Initially, we note that the "strike with pay provision" of the original Daniels Bill in the House, was quite different from the regulation here in question. The proposal in Congressman Daniels' bill dealt with the problems of increasing concentrations of toxic substances, not immediate hazards of all kinds to both health and safety. The walk-off-the-job provision in that bill did not require an imminent threat to life, and required sixty days of employer inaction and a certification by the Secretary that the substance in question was indeed toxic. This curiously circumscribed provision was quickly saddled with the sobriquet "strike with pay."
 
 
 69
 Crucial to an understanding of Congressional opposition is the term "with pay." As the court noted in Usery v. Babcock and Wilcox Co., 424 F.Supp. 753, 756 (E.D.Mich.1976), it is obvious that Congress' concern was specifically aimed against workers walking off the job with pay. No mention whatever was made of worker's rights to refuse to perform dangerous work assignments without pay. The very fact that the section was misentitled "strike with pay" and was constantly referred to as such[35] is the clearest indication possible that Congress was specifically concerned with the monetary incentive that workers would have by claiming that they believed a situation was hazardous and then sitting back and collecting their paychecks for doing nothing.
 
 
 70
 It is easy to understand why Congressman Daniels stated that this provision had been "misunderstood" and why he offered to drop it. There is no indication that this provision was ever viewed as the equivalent of the regulation which here allows the worker to protect himself from imminent danger to both health and safety.
 
 
 71
 Defendant Detroit Steel finds it significant that Representative Daniels' proposed amendments to his bill would have both deleted the so-called "strike with pay" provision and substituted in its place a provision giving employees subject to an imminent danger the right to summon an OSHA inspector into the plant at once. Since Representative Daniels' proposed amendment was never acted upon,[36] we decline to accord significance to this event. Even granting Detroit Steel's argument, there is no indication that Congressman Daniels, or Congress, contemplated the problem which the regulation addresses.
 
 
 72
 It is established law that employees have the right to strike in this country. Employees are specifically permitted to walk off the job without reprisal under Federal Labor Law in two instances.[37] First, where such conduct can be deemed concerted activity under § 7 of the National Labor Relations Act, 29 U.S.C. § 157. See N. L. R. B. v. Washington Aluminum Co.,370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); N. L. R. B. v. Leslie Metal Arts Co., 509 F.2d 811 (6th Cir. 1975); N. L. R. B. v. KDI Precision Products Inc., 436 F.2d 385 (6th Cir. 1971). See also Eastex, Inc. v. N. L. R. B., 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). Second, where there exists a collective bargaining agreement prohibiting strikes and mandating arbitration of grievances, refusal of employees to work under hazardous conditions is not an illegal strike. § 502 of the Taft-Hartley Act,29 U.S.C. § 143. See N. L. R. B. v. Knight Morley Corp., 251 F.2d 753 (6th Cir.), Cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1957), Cf. Gateway Coal Co. v. UMW, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), (standard to be used is objective); Plain Dealer Publishing Co. v. Cleveland Typo Union # 53, 520 F.2d 1220, 1229 (6th Cir. 1975) (adopting district court opinion) (applying objective standard and finding legitimate fear of violence prevented employees from crossing picket lines).
 
 
 73
 Congress was well aware that workers covered by the National Labor Relations Act possessed the right to strike over unsafe working conditions.[38] It is only when one adds the additional element of being paid to strike that Congressional opposition comes into focus.[39] This is apparent from Senator Williams' statement when he introduced his bill on the Senate Floor:
 
 
 74
 "I should also add, despite some widespread contentions to the contrary, that the Committee bill does not contain a so-called strike With pay provision. Rather than raising a possibility for endless disputes whether employees were entitled to walk off the job With full pay, it was decided in committee to enhance the prospects of compliance by the employer through such means as giving the employees the right to request a special Labor Department investigation or inspection." (Emphasis added).
 
 
 75
 116 Cong.Rec. 37326, Reprinted in Legislative History at 416. Senator Williams was not concerned over whether employees could walk off the job in the face of hazardous working conditions; his concern was clearly directed to the added incentive of full pay.
 
 
 76
 The second aspect of the legislative history which defendants urge in support of their position surrounds the legislative evolution of the "imminent danger" provisions of the Act, 29 U.S.C. § 662. In the House, the original Daniels' bill allowed OSHA inspectors to issue administrative orders for up to five days which would "prohibit the employment or presence of any individuals in locations or under conditions where such imminent danger exists, except to correct or remove it." H.R. 16785, 91st Cong., 2d Sess. § 23(a) (1970), Reprinted in Legislative History 893, 955-56. See also the accompanying Committee report H.R.No.11291, 91st Cong., 2d Sess. 25 (1970), Reprinted in Legislative History at 855. (provision modeled after the principles of the New York State Health and Safety Code). United States District Courts, upon application by the Secretary, had the authority to enjoin business operations for greater periods of time. Id. The alternative Steiger bill gave the courts exclusive authority to enjoin violations, upon application of the Secretary.[40] H.R. 19200, 92nd Cong., 2d Sess. § 12 (1970), Reprinted in Legislative History at 796-98. As noted, it was this latter bill which the House adopted.
 
 
 77
 The Williams Bill in the Senate contained an imminent danger provision which authorized an OSHA inspector under certain circumstances, to issue an order restraining an employer's business operations for up to 72 hours.[41] This authority could only be exercised if the Secretary had insufficient time to get a court ordered injunction and the Secretary was required to provide certain review procedures to help minimize arbitrary abuse.[42]
 
 
 78
 When the Senate bill (the Williams bill) and the House bill (the Steiger bill) were submitted to a conference committee, the Senate receded from its provision permitting OSHA inspectors to issue 72 hour administrative restraining orders.[43]
 
 
 79
 Thus, the Act as finally passed contained no administrative shut down authority. Defendants argue that Congress could not have meant to give shut down authority to employees which it declined to give to inspectors.
 
 
 80
 Proper analysis of Congressional rejection of the Senate shut down provision must begin with the disputed section itself:
 
 
 81
 If the Secretary determines that the imminence of a danger referred to in subsection (a) is such that immediate action is necessary, and the Secretary determines that there is not sufficient time, in light of the nature and imminence of the danger, to seek and obtain a temporary restraining order or injunction under subsection (a) of this section, the Secretary shall issue an order requiring such steps to be taken as may be necessary to avoid, correct, or remove such imminent danger and prohibiting the employment or presence of any individual in locations or under conditions where such imminent danger exists, except individuals whose presence is necessary to avoid, correct, or remove such imminent danger, or to maintain the capacity of a continuous process operation to restart without a complete cessation of operations, or where a cessation of operations is necessary, to permit such to be accomplished in a safe and orderly manner. Such order may remain in effect for not more than seventy-two hours from the time of its issuance. If the Secretary delegates his authority to issue such an order to close a business or plant, in whole or in substantial part, he shall provide that such an order may not be issued until the employer has been notified in writing, signed by the delegate of the Secretary, setting forth specifically the nature and imminence of the danger compelling immediate action and the concurrence of an official of the Labor Department appointed by the President with the advice and consent of the Senate is first obtained. The Secretary shall by regulation provide appropriate procedures whereby an employer may obtain expeditious informal reconsideration by officials of the Department of Labor of any order issued under this subsection.
 
 
 82
 S. 2193 § 12(b) (1970), Reprinted in Legislative History at 562-63.
 
 
 83
 This provision is in no way similar to the regulation promulgated by the Secretary of Labor.[44] Section 12(b) allowed an official to close down an entire plant. Further, on the spot changes could be ordered solely on authority of an OSHA inspector. Apparently, only if a shut down order would close a plant "in substantial part" did the inspector need to get permission from higher-ups.[45]
 
 
 84
 It is apparent from an examination of the legislative history that Congressional concern was directed to the possibilities of abuse of authority which lurked behind administrative shut downs. The provision was branded as unconstitutional.[46] Particular fears were voiced over the pressures which could be brought to bear on an inspector during a strike.[47] One can easily discern the scenarios which Congress feared an inspector confronting company officials with on the spot demands backed up by threats of partial shut down. Or, striking workers pressuring an inspector to shut down a section of a plant manned by strikebreakers.
 
 
 85
 What Congress feared was arbitrary governmental authority brought to bear on an employer to take certain action. This is quite different from allowing workers to save themselves from apparent imminent harm. A vulnerable or misguided federal inspector might abuse his authority. Allowing an employee or group of employees to reasonably refuse to subject themselves to danger under this regulation presents no similar abuse possibilities. The employee cannot affirmatively order any changes; the fear of danger must be objectively reasonable and must be Subsequently found such by the Courts; there must be insufficient time to go through normal enforcement channels; if no other work is available, the employee loses his/her pay. Thus, the regulation carefully restricts the exercise of the right it affords. In contrast § 23(b) imposed minimal curbs to protect against an arbitrary inspector.[48] It was this inherent lack of control over a potentially abusive bureaucrat at which Congress recoiled.
 
 
 86
 The Secretary's regulation at issue in this case does not authorize self-help to pay without work. Under the regulation an employee who faces urgent danger of "life or serious injury" may do what the Thirteenth Amendment to the Constitution also allows. He may leave the job. If he does, however, the employer may discharge him. At that point not only does his pay cease, but he may have lost (possibly forever) many previously acquired seniority and pension rights. The regulation provides equitable relief to him when the Secretary has decided to file a complaint and there has been due process adjudication. At trial he must prove before a federal judge 1) his good faith in taking the action, 2) that he had no reasonable alternative, and 3) that his apprehension of death or serious injury was based on circumstances then facing him which would cause a reasonable person to reach the same conclusion, and 4) that the urgency of the situation provided "insufficient time . . . to eliminate the danger by resort to regular statutory enforcement channels."
 
 
 87
 This issue is better seen as presenting a situation in which "the courts must . . . in effect, consider what answer the legislature would have made as to a problem that was neither discussed nor contemplated." Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 313, 486 F.2d 375, 380 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). As indicated in part II, Supra, we think it is clear what answer Congress would have given had it directly considered the regulation.
 
 
 88
 Our conclusion is reinforced because when Congress subsequently directly addressed this question, when considering the Federal Mine Safety and Health Amendments of 1977, 91 Stat. 1290, 30 U.S.C. § 801 Et seq., it expressly indicated that a miner could refuse to work if he had a good faith belief that his job would subject him to unsafe or unhealthful working conditions. As here, the Mine Safety and Health Act does not expressly provide for that right.[49] However, that Act's legislative history makes it clear that Congress desired that miners be allowed to withdraw from danger on the job without fear of retaliation. The Senate Report accompanying the Act provides:
 
 
 89
 This section is intended to give miners, their representatives, and applicants, the right to refuse to work in conditions they believe to be unsafe or unhealthful and to refuse to comply if their employers order them to violate a safety and health standard promulgated under the law.
 
 
 90
 S.Rep.No.95-181 p. 36 (1977), Reprinted in 1977 U.S.Code Cong. & Admin.News, pp. 3401, 3436. Nor can it be said that this issue surreptitiously sneaked by Congress; it was openly raised on the Senate Floor:
 
 
 91
 Mr. CHURCH. I wonder if the distinguished chairman would be good enough to clarify a point concerning section 10600, the discrimination clause?
 
 
 92
 It is my impression that the purpose of this section is to insure that miners will play an active role in the enforcement of the act by protecting them against any possible discrimination which they might suffer as a result of their actions to afford themselves of the protection of the act.
 
 
 93
 It seems to me that this goal cannot be achieved unless miners faced with conditions that they believe threaten their safety or health have the right to refuse to work without fear of reprisal. Does the committee contemplate that such a right would be afforded under this section?
 
 
 94
 Mr. WILLIAMS. The committee intends that miners not be faced with the Hobson's choice of deciding between their safety and health or their jobs.
 
 
 95
 The right to refuse work under conditions that a miner believes in good faith to threaten his health and safety is essential if this act is to achieve its goal of a safe and healthful workplace for all miners.
 
 
 96
 Mr. JAVITS. I think the chairman has succinctly presented the thinking of the committee on this matter. Without such a right, workers acting in good faith would not be able to afford themselves their rights under the full protection of the act as responsible human beings.
 
 
 97
 123 Cong.Rec. at S10287-88 (daily ed. June 21, 1977). Similar sentiments were voiced on the House floor:
 
 
 98
 If miners are to invoke their rights and to enforce the act as we intend, they must be protected from retaliation. In the past, administrative rulings of the Department of the Interior have improperly denied the miner the rights Congress intended. For example, Baker v. North American Coal Co., 8 IBMA 164 (1977) held that a miner who refused to work because he had a good faith belief that his life was in danger was not protected from retaliation because the miner had no "intent" to notify the Secretary. This legislation will wipe out such restrictive interpretations of the safety discrimination provision and will insure that they do not recur.
 
 
 99
 123 Cong.Rec. at H. 11662 (daily ed. Oct. 27, 1977) (Rep. Perkins). Significantly, our review of the floor debates reveals no controversy whatsoever on this issue, although other provisions of the Act were heatedly debated.[50]
 
 
 100
 We are aware that this was not the same Congress which passed the Occupational Safety and Health Act. We are also aware that this Act has less far-reaching effect than the Occupational Safety and Health Act.[51] At the same time, we cannot ignore the utter lack of controversy when Congress squarely faced the walk-off-the-job-in-the-face-of-danger issue at a later time. We additionally note the prominent endorsement of the Secretary's position here by three persons who were instrumental in the passage of OSHA Senators Williams and Javits and Congressman Perkins. We do not think that these gentlemen or Congress would endorse self-protection for miners and deny that same self-protection to other workers.
 
 IV
 
 101
 In conclusion, we perceive no mandate in OSHA's legislative history that we deprive American workers of the limited protection afforded them by the regulation. We are persuaded that the regulation is a valid exercise of the Secretary's broad rule-making authority and that it is consistent with the Act and with Congressional intent.
 
 
 102
 We are aware that our holding places us squarely in conflict with that of the Fifth Circuit in Marshall v. Daniel Construction Co., 563 F.2d 707 (5th Cir. 1977), Cert. denied, --- U.S. ----, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). However we cannot, in good conscience, adopt that court's reasoning. Instead, we find ourselves in full agreement with Judge John Minor Wisdom's dissent in that case and with his conclusion that the same Congress which wanted employees to work in safe and healthful surroundings could not have meant for them to die at their posts. A worker should not have to choose between his job and his life without the reasonable safeguard provided by this regulation.
 
 
 103
 The judgments below are reversed and remanded for further proceedings. The district judge's findings of fact in No. 76-2144 are affirmed.
 
 
 
 [1]
 29 C.F.R. § 1977.12, Reprinted in text, Infra
 
 
 [2]
 29 U.S.C. § 660(c)(1) provides:
 No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to (OSHA) or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by (OSHA).
 
 
 [3]
 29 U.S.C. § 660(c)(2) provides:
 Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of (29 U.S.C. § 660(c)(1)) may, within thirty days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall cause such investigation to be made as he deems appropriate. If upon such investigation, the Secretary determines that the provisions of (29 U.S.C. § 660(c)(1)) have been violated, he shall bring an action in any appropriate United States district court against such person. In any such action the United States district courts shall have jurisdiction, for cause shown to restrain violations of (29 U.S.C. § 660(c)(1)) and order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay.
 
 
 [4]
 Reported as Usery v. Whirlpool Corp., 416 F.Supp. 30 (N.D.Ohio 1976)
 
 
 [5]
 The District Judge's fact finding appears at 416 F.Supp. 30, 32 (N.D.Ohio 1976). In No. 76-2144, the Whirlpool Corporation cross-appeals, claiming that the District Judge's findings of fact were clearly erroneous regardless whether the regulation was valid. Our examination of the record, however, reveals ample support for his conclusion that the employees declined to do their work because they reasonably feared for their lives
 
 
 [6]
 The employee's death resulted in the company's being cited for violation of OSHA's general duty clause, 29 U.S.C. § 654(a)(1). As of this writing, over four years later, the company's citation is still in administrative litigation
 
 
 [7]
 Since the writ of mandamus has been abolished in federal practice, F.R.Civ.Pro. 81(b), the Act presumably contemplates injunctive relief against the Secretary. See Oldham, OSHA May Not Work in "Imminent Danger" Cases, 60 A.B.A.J. 690 (1974)
 
 
 [8]
 We additionally note that employees are under a duty to comply with safety and health standards under the Act. 29 U.S.C. § 654(b). In theory, an employee could be cited for continuing to work under hazardous conditions!
 
 
 [9]
 See, E. g. Baltimore & Ohio R. Co. v. O. S. H. R. C., 179 U.S.App.D.C. 97, 548 F.2d 1052 (1976)
 
 
 [10]
 See S.Rep.No.91-1282, 91st Cong., 2d Sess. 11-12, 21 Reprinted in Subcommittee on Labor, the Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970 (Committee Print June 1971) (hereinafter cited as Legislative History) at 151-52, 161 and Reprinted in 1970 U.S.Code Cong. & Admin.News pp. 5177, 5188-89, 5198; H.Rep.No.91-1291, 91st Cong., 2d Sess. 22, 31, Reprinted in Legislative History at 852, 861; 116 Cong.Rec. 36530, Reprinted in Legislative History at 399 (Sen. Saxbe)
 
 
 [11]
 The regulation does not affect the vast majority of responsible employers who would never consider forcing workers to labor under imminently hazardous conditions. Only a handful of irresponsible employers are affected and the regulation may benefit them. If death or injury occurs on the job, the employer faces potential liability under OSHA or state health and safety codes. Indeed, a wilful violation of OSHA which results in death to an employee may subject an employer to criminal prosecution. 29 U.S.C. § 666(e). And since state workmen's compensation statutes are experience-based, the employer would end up paying in the long run as well. See, e. g. Ohio Rev. Code §§ 4123.29, 4123.34; State ex rel. Zone Cab Corp. v. Industrial Comm. of Ohio, 132 Ohio St. 156, 5 N.E.2d 477 (1936)
 
 
 [12]
 29 U.S.C. § 158 provides:
 (a) It shall be an unfair labor practice for an employer
 (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this (Act).
 
 
 [13]
 30 U.S.C. § 820(b)(1) provided:
 (b)(1) No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.
 That section was amended by the Federal Mine Safety and Health Amendments of 1977. Now codified at 30 U.S.C. § 815, it provides:
 (c)(1) No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, or because such miner, representative of miners or applicant for employment is the subject of medical evaluations and potential transfer under a standard published pursuant to section 811 of this title or because such miner, representative of miners or applicant for employment has instituted or caused to be instituted any proceeding under or related to this chapter or, has testified or is about to testify in any such proceeding, or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter.
 
 
 [14]
 42 U.S.C. § 2000e-3 provides:
 (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this (Act).
 
 
 [15]
 29 U.S.C. § 215(a) provides:
 . . . it shall be unlawful for any person
 (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;
 
 
 [16]
 See fn. 12, Supra
 
 
 [17]
 This Court's decision in Hoover Design Corp. v. NLRB, 402 F.2d 987 (6th Cir. 1968), which narrowly construed § 8(a)(4) of the NLRA cannot survive Scrivener. See NLRB v. Retail Store Emp. U., Local 876, 570 F.2d 586, 591 n. 5 (6th Cir. 1978)
 
 
 [18]
 It is true that the mining company had established a safety complaint procedure the first step of which was for a worker to bring a complaint to the attention of a foreman. The Phillips' court took particular notice of this and found resort to the procedure to be protected. Id. 163 U.S.App.D.C. 111, 113, 500 F.2d at 779-81. There is no reason to accord lesser protection to employees of companies without such formal procedures. See Baker v. U.S. Dept. of the Interior Board of Mine Operations Appeals, 193 U.S.App.D.C. ---, 595, F.2d 746 (1978)
 
 
 [19]
 See fn. 13, Supra
 
 
 [20]
 See fn. 13, Supra
 
 
 [21]
 The recently amended Coal Mine Safety & Health Act does contain similar broad language. However, at the time of the D.C.Circuit's opinions in Phillips and Munsey, that Act contained no such language. See fn. 13, Supra. In addition, the Farm Labor Contractor Registration Act also contains similar language. See 7 U.S.C. § 2050a
 
 
 [22]
 It is true that this Circuit has held in Russell v. Bartley, 494 F.2d 334 (6th Cir. 1974), that no private cause of action arises from the Occupational Safety and Health Act. Russell is in accord with the view of other courts that both the express provisions of the Act (See 29 U.S.C. § 653(b)(4)) as well as the overall enforcement scheme (the Secretary of Labor bringing suits on behalf of aggrieved employees) indicated that Congress meant that no private cause of action for damages should arise. See E. g. Skidmore v. Travelers Ins. Co., 356 F.Supp. 670 (E.D.La.), Aff'd 483 F.2d 67 (5th Cir. 1973)
 The policy factors which underly cases allowing implied causes of action are applicable here, however. "It is the duty of the courts to be alert to provide such remedies as are necessary to make effective the Congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964).
 The general rule to be applied was well stated by Judge Learned Hand in Reitmeister v. Reitmeister, 162 F.2d 691, 694 (2d Cir. 1947), when he implied a private cause of action arising from a violation of § 605 of the Federal Communications Act:
 Although the Act does not expressly create any civil liability, we can see no reason why the situation is not within the doctrine which, in the absence of contrary implications, construes a criminal statute, enacted for the protection of a specified class, as creating a civil right in members of the class, although the only express sanctions are criminal.
 Especially relevant is Wyandotte Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), where the Court implied a civil remedy because the criminal remedy expressly authorized by the statute was inadequate to ensure the statute's effectiveness. 389 U.S. at 202, 88 S.Ct. 379. Of course, a court will not imply remedies from a statute under all circumstances. Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), indicate that no remedy will be implied if the statute was not designed to protect the class seeking the particular remedy, or if the remedy would be inconsistent with the overall scheme of the statute, or if the remedy is unnecessary to effectuate the Congressional policy underlying the statute. None of these factors is present here.
 
 
 [23]
 This Court requested the parties to brief the question of what additional common law or statutory protections existed in favor of employees who refused to work for fear of their safety. We conclude that other protections are inadequate and that the Secretary's regulation is entirely consistent with what other protections do exist
 Common law tort remedies are extremely limited, at best an employee can sue for on the job injuries after the injury occurs. See Prosser on Torts § 80 (4th ed. 1971). Although there have been some recent changes, courts are reluctant to limit an employers' contractual right to discharge an employee. See Percival v. General Motors Corp., 539 F.2d 1126 (8th Cir. 1976). The Oregon Supreme Court has held that although it would be willing to extend common-law protection to employees who complain about safety, there was no need to do so because of OSHA! Walsh v. Consolidated Freightways, Inc., 278 Or. 347, 563 P.2d 1205 (1977). We cannot abdicate our responsibilities under OSHA in the hope that state courts will extend needed protection to workers.
 As indicated above, workers do have protection under § 7 of the N.L.R.A. That statute has gaps, however, which OSHA does not have. The N.L.R.A. does not protect agricultural workers or supervisors. See 29 U.S.C. § 152(3). Small employers are exempt because the N.L.R.B. does not choose to exercise jurisdiction over them. See Siemons Mailing Service, 122 N.L.R.B. 81 (1958). The Secretary's well-drafted supplemental brief cites estimates that the N.L.R.A. covers 44 million employees and OSHA 64 million. Supp. Memorandum at 11.
 Additionally, if a solitary employee withdraws from a work hazard, there is doubt that he will be protected under the N.L.R.A. The N.L.R.B. has squarely found protected activity where a solitary employee complains about work safety and files a complaint with OSHA. Jim Causley Pontiac, 232 N.L.R.B. No. 37 (1977); B&P Motor Express, Inc., 230 N.L.R.B. No. 96 (1977); Alleluia Cushion Co., 221 N.L.R.B. 999 (1975). The "implied concert" theory on which these decisions are based, however, has received a cold reception in some Courts of Appeal. See N. L. R. B. v. C. & I. Air Conditioning, 486 F.2d 977 (9th Cir. 1973); N. L. R. B. v. Northern Metal Co., 440 F.2d 881 (3d Cir. 1971). Compare N. L. R. B. v. Brown, 546 F.2d 690 (6th Cir. 1976).
 It is clear, moreover, that the remedies afforded a discharged employee under OSHA and the N.L.R.B. are coextensive. The Alleluia Cushion Co., line of cases, Supra, demonstrates that no clash exists between them.
 See generally Ashford & Katz, Unsafe Working Conditions: Employee Rights under the Labor Management Relations Act and the Occupational Safety & Health Act, 52 Notre Dame Lawyer 802 (1977); M. Rothstein, Occupational Safety and Health Law §§ 186 Et seq. (West.1978)
 
 
 [24]
 For text of this bill, See Legislative History at 721
 Four bills had been originally introduced in the House of Representatives in 1969; The Administration bill (H.R. 13373), Reprinted in Legislative History at 679, Representative Hathaway's bill (H.R. 843), Reprinted in Legislative History at 599, Representative O'Hara's bill (H.R. 3809) Reprinted in Legislative History at 629; and Representative Perkins' bill (H.R. 4294), Reprinted in Legislative History at 659.
 H.R. 16785 (1970), Representative Daniels' bill, was introduced on April 7, 1970, and emerged from the House Education and Labor Committee three months later. This bill was supported by organized labor. Thwarted in committee, congressmen opposed to the bill rallied around H.R. 19200 (1970), Reprinted in Legislative History at 763, which was introduced in September of 1970 as an alternative to the Daniels' bill.
 
 
 [25]
 This section provided:
 "The Secretary of Health, Education and Welfare shall publish within six months of enactment of this Act and thereafter as needed, but at least annually, a list of all known or potentially toxic substances and the concentrations at which such toxicity is known to occur; and shall determine following a request by any employer or authorized representative of any group of employees whether any substance normally found in the working place has potential toxic or harmful effects in such concentration as used or found; and shall submit such determination both to employers and affected employees as soon as possible. Within sixty days of such determination by the Secretary of Health, Education and Welfare of potential toxicity of any substance, an employer shall not require any employee to be exposed to such substances designated above in toxic or greater concentrations unless it is accompanied by information, made available to employees by label or other appropriate means, of the known hazards or toxic or long-term ill effects, the nature of the substance, and the signs, symptoms, emergency treatment and proper conditions and precautions of safe use, and personal protective equipment is supplied which allows established work procedures to be performed with such equipment, or unless such exposed employee may absent himself from such risk of harm for the period necessary to avoid such danger without loss of regular compensation for such period." H.R. 16785 § 19(a), (1970), Reprinted in Legislative History at 755-56, and Reprinted in H.Rep.No.91-1291, 91st Cong., 2d Sess. 12 (1970), also Reprinted in Legislative History at 842.
 The Committee's accompanying report provides an explanation for this provision:
 "Because any workable solution to covering new (toxic) substances would have to be fast-acting and self-enforcing, the Committee adapted a two-step process whereby workers or employers could submit unknown substances to the Department of Health, Education and Welfare for a determination of their toxicity. Only after the Department of Health, Education and Welfare made a determination that a substance was toxic would employees have a right to information about these substances or a right to necessary protective equipment, if any. To assure these rights, the bill guarantees that employees may not be forced to work without these safeguards. There is still a real danger that an employee may be economically coerced into self-exposure in order to earn his livelihood, so the bill allows an employee to absent himself from that specific danger for the period of its duration without loss of pay. However, the Committee intends that the danger cannot be deliberately caused by the employee. The Department of Labor will implement this intent. Nothing herein restricts the right of the employer, except as he is obligated under other agreements, to assign a worker to other nonprohibited work during this time. This should eliminate possible abuse by allowing the employer to avoid payment for work not performed." H.Rep.No.91-1291, 91st Cong., 2d Sess. 29-30 (1970), Reprinted in Legislative History at 859-860.
 
 
 [26]
 It must be emphasized that the controversy over which Occupational Safety and Health bill to enact did not center on the "strike with pay" provision. An examination of the legislative history reveals that the principal opposition of republicans to the labor-supported bills which emerged from Committee in both the Senate and the House concerned: 1) Which agency was to set health and safety standards, 2) Whether an independent adjudicatory body should be established to administratively review violations, 3) Whether employers should be subject to a general requirement to provide a safe and healthful work environment, 4) Whether the Secretary of Labor should have authority to order administrative shutdowns in cases of imminent danger (discussed Infra )
 See, e. g., H.Rep.No.91-1291, 91st Cong., 2d Sess. 47-60 (1970), Reprinted in Legislative History at 877-890; S.Rep.No.91-1282, 91st Cong., 2d Sess. 54-64 (1970), Reprinted in Legislative History at 193-203 and Reprinted in 1970 U.S.Code Cong. & Admin.News, pp. 5177, 5218-5227.
 
 
 [27]
 The proposed addition provided:
 "Any employees or representative of employees who believe that a violation of health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employees or representative of employees, except that, upon the request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear on any record published, released, or made available pursuant to this Act. If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable, to determine if such violations or danger exist. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists he shall notify in writing the employees or representative of the employees of such determination."
 
 
 [116]
 Cong.Rec. 23645 Reprinted in Legislative History at 1008
 
 
 [28]
 The Secretary also argues that because Representative Daniels amended his bill to remove the alleged "strike with pay" language, the vote between his bill and the Steiger bill was one in which Neither bill had any provision concerning this issue. Br. for the Sec'y at 30 n. 13. The legislative history, however, is clear that Representative Daniels' proposed amendments were never acted upon and that it was his original bill which was voted down in favor of the Steiger bill. See 116 Cong.Rec. 38369-70 (1970), Reprinted in Legislative History at 985-986 (Congressman Perkins); 116 Cong.Rec. 38375-78, Reprinted in Legislative History at 1006-1010 (Congressman Daniels); 116 Cong.Rec. 38704-05, Reprinted in Legislative History at 1064 (Congressman Perkins); 116 Cong.Rec. 38705, Reprinted in Legislative History at 1065 (Congressman Daniels); 116 Cong.Rec. 38707, Reprinted in Legislative History at 1072 (Congressman O'Hara); 116 Cong.Rec. 38714, Reprinted in Legislative History at 1089 (Congressman Horton)
 
 
 [29]
 See 116 Cong.Rec. 38723, Reprinted in Legislative History at 1112-15
 
 
 [30]
 In relevant part, the bill provided:
 Sec. 12. (a) The United States district courts shall have jurisdiction, upon petition of the Secretary, to restrain any conditions of practices in any place of employment which are such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by this Act.
 (b) Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order pending the outcome of an enforcement proceeding pursuant to section 11 of this Act. The proceeding shall be as provided by Rule 65 of the Federal Rules, Civil Procedure, except that no temporary restraining order issued without notice shall be effective for a period longer than five days.
 (c) Whenever and as soon as an inspector concludes that conditions or practices described in subsection (a) exist in any place of employment, he shall inform the affected employees and employers of the danger and that he is recommending to the Secretary that relief be sought.
 (d) If the Secretary unreasonably fails to petition the court for appropriate relief under this section and any employee is injured thereby either physically or financially by reason of such failure on the part of the Secretary, such employee may bring an action against the United States in the Court of Claims in which he may recover the damages he has sustained, including reasonable court costs and attorney's fees.
 (e) In any case where a temporary restraining order is obtained under this section by the Secretary, the court which grants such relief shall set a sum which it deems proper for the payment of such costs, damages, and attorney's fees as may be incurred or suffered by any employer who is found to have been wrongfully restrained or enjoined. In no case shall any employer wrongfully restrained or enjoined be entitled to a recovery for costs, damages, and attorney's fees in excess of the sum set by the court.
 H.R. 19200, 91st Cong., 2d Sess. (1970), Reprinted in Legislative History at 796-798, 1101-1102. Contrast Congressman Daniels proposed amendment, Supra at fn. 27.
 
 
 [31]
 S. 2193 (1970), Reprinted in Legislative History at 204
 
 
 [32]
 In relevant part, the Williams' bill provided:
 "Any employees or representatives of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, and shall set with reasonable particularity the grounds for the notice, and shall be signed by the employees or representatives of employees, except that, upon the request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear on any records, published, released, or made available pursuant to subsection (g) of this section. If upon receipt of such notification, the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable, to determine if such violations or danger exists. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists, he shall notify in writing the employees or representative of the employees of such determination." S. 2193 § 8(f)(1), (1970), Reprinted in Legislative History at 252-253.
 
 
 [33]
 Opposition centered around the bill's provisions setting standard-making and adjudication in the Secretary of Labor and the bill's authorization of administrative shutdowns. S. 2193 §§ 6, 10c, 11 (1970). The controversy is fully aired in the Senate Report, S.Rep.No.91-1282, 91st Cong., 2d Sess. 54-64 (1970), Reprinted in Legislative History at 193-203 and Reprinted in 1970 U.S.Code, Cong. & Admin.News, pp. 5218-5227. See generally the debate on the Senate Floor on October 14 and November 16, 17, 1970, Reprinted in Legislative History at 407-528
 
 
 [34]
 As noted above, See fn. 27 and accompanying text, in response to opposition to the so-called "strike with pay" provision, Representative Daniels also offered an amendment to his bill which would have given employees subject to imminent danger the right to summon an OSHA inspector into the situation promptly
 
 
 [35]
 We consider it significant that Every time that the question of employees walking off the job was addressed, it was always in the "with-pay" context. Senator Williams stated that ". . . the committee bill does not contain a so-called strike With pay provision," because of the "possibility for endless disputes over whether employees were entitled to walk off the job With full pay . . ." 116 Cong.Rec. 37326, Reprinted in Legislative History at 416. Representative Perkins spoke on the House floor of the offer to delete "(t)he provision that would have permitted an employee to absent himself from exposure to a toxic substance Without loss of pay, the so-called Strike with pay provision . . ." 116 Cong.Rec. 38369, Reprinted in Legislative History at 986. Representative Daniels initially stated that ". . . the provision in the committee bill which has been frequently misinterpreted as a 'Strike with pay ' provision has also been deleted." 116 Cong.Rec. 38376, Reprinted in Legislative History at 1005. He subsequently explained that this provision would have permitted "employees to absent themselves from dangerous situations Without loss of pay." 116 Cong.Rec. 38378, Reprinted in Legislative History at 1009. He further went on to state that "the provision on employees Not losing pay was so generally misunderstood that we have decided to drop it. We have no provisions For payment of employees who want to abstain themselves from risk of harm." 116 Cong.Rec. 38378, Reprinted in Legislative History at 1009
 There were four other references to the provision in the legislative history, Representatives Randall, Feigham and Horton echoed: "The provision that has been attacked as giving employee (sic) the right to 'Strike with pay ' will be deleted." 116 Cong.Rec. 38378, 38390, 38714, Reprinted in Legislative History at 101, 1046, 1089. Also, Representative Daniels additionally stated in later argument on the House floor "(w)e have deleted a provision which was though inaccurately called a 'strike With pay ' provision and have provided that employees may request an inspection when they are subjected to dangers at the work-place." The above references clearly demonstrate Congress' preoccupation with paying people to walk off the job. (emphasis supplied throughout).
 
 
 [36]
 See fn. 28, Supra
 
 
 [37]
 See also fn. 23, Supra
 
 
 [38]
 Indeed, explicit reference to this was made on the House floor. 116 Cong.Rec. 422 (1970), Reprinted in Legislative History at 1223-24 (Rep. Sherle)
 
 
 [39]
 Compare the "political hot potato" of whether a state can pay unemployment benefits to striking workers. See New York Tel. Co. v. New York State Dept. of Labor, 566 F.2d 388, 394 (2d Cir. 1977), Cert. granted, 438 U.S. 904, 98 S.Ct. 3121, 57 L.Ed.2d 1146 (1978)
 
 
 [40]
 In additional response to the Steiger Bill, Representative Daniels also offered to amend his bill to "rely exclusively on judicial remedies to counteract these imminent dangers. Our provision is now identical to that in the Steiger substitute." 116 Cong.Rec. 38376, Reprinted in Legislative History at 1005
 
 
 [41]
 S. 2193 § 12 (1970), Reprinted in Legislative History at 561-64. See S.Rep.No.91-1282, 91st Cong., 2d Sess. 12-13 (1970) Reprinted in Legislative History at 152-53, and Reprinted in 1970 U.S.Code Cong. & Admin.News, p. 5177
 
 
 [42]
 The drastic administrative shut down provisions in the original Williams bill, S. 2193, 91st Cong., 1st Sess., § 6(a)(2) (1969), Reprinted in Legislative History at 1, 12-13, were modified in committee to a 72-hour maximum period and required concurrence by a regional Labor Department official. S. 2193, 91st Cong., 2d Sess., § 11(b) (1970), Reprinted in Legislative History at 263-64. See S.Rep.No.91-1282, 56-57 (1970), Reprinted in Legislative History at 195-96, and Reprinted in 1970 U.S.Code Cong. & Admin.News, p. 5221 (Minority views of Senator Javits). An effort on the Senate floor to entirely eliminate administrative shut downs, spearheaded by Senator Saxbe, fell short by only two votes. See 116 Cong.Rec. 37601-05 (1970) (roll call vote, and debate), Reprinted in Legislative History at 451-61. However, additional safeguards were added to further minimize abuse written notice and concurrence of a cabinet or sub-cabinet level official for plant closings. See 116 Cong.Rec. 37624, Reprinted in Legislative History at 508-09
 
 
 [43]
 H.Rep.No.1765, 91st Cong., 2d Sess. 40 (1970), Reprinted in Legislative History at 1193, And reprinted in 1970 U.S.Code Cong. & Admin.News, p. 5236
 
 
 [44]
 Detroit Steel argues that the following statement by Senator Williams shows that his bill provided for 72 hour shut downs in lieu of employee walking off the job:
 The committee bill, while guarding against frivolous complaints, permits employees or their representatives to request inspections where they believe that a violation of a safety and health standard exists that threatens physical harm or that an imminent danger exists.
 The substitute bill has absolutely no comparable provision for what in so many clearly life and death instances is the minimum assurance to which the employee is entitled.
 
 
 [116]
 Cong.Rec. 37340-41, Reprinted in Legislative History at 432-33
 This statement arose when the Senate was considering choosing between Senator Williams' bill and a rival bill which was sponsored by Senator Peter Dominick, S. 4404, 91st Cong., 2d Sess. 1970, Reprinted in Legislative History at 73.
 This statement was made in the heat of debate; it was Senator Williams' ninth reason why his bill was superior to the alternative bill. Senator Williams' tenth reason went as follows:
 Tenth. The Committee bill provides that in imminent danger situations the Secretary may bring action in the appropriate U.S. district court for a temporary restraining order or an injunction requiring steps to be taken to correct, remove, or avoid the danger, and prohibiting the presence of individuals where the imminent danger exists.
 However, the bill authorizes the continued presence of individuals necessary to the correction or removal of the danger or to maintain the capacity of a continuous process operation to restart without a complete cessation of operations, and to permit any necessary shutdown of operations to be accomplished in a safe and orderly manner.
 The committee bill also permits the Secretary, if he determines that the danger of death or serious harm is so immediate that action must be taken without awaiting the institution of court proceedings, to order such action to be taken and his order may remain in effect for 72 hours.
 This is one of the areas in which there is clearly a distinction between the bill as reported by the committee and the substitute proposed. These are the true emergency situations where time manifestly is of the essence.
 It is clear that Senator Williams' statement, in context, is consistent with the Secretary's regulation. Even if the opposite were true, the invidious comparison he drew between his bill and Senator Dominick's bill, in the frenzy of argument, is deserving of little weight in determining the meaning of his bill.
 
 
 [45]
 See 116 Cong.Rec. 37624, Reprinted in Legislative History at 508 (Sen. Javits)
 
 
 [46]
 H.Rep.No.1291, 91st Cong., 2d Sess. 56, Reprinted in Legislative History at 886 (minority views) ("In essence, the exercise of this shut-down power amounts to summary punishment which is contrary to our established standards of law"); 116 Cong.Rec. 37602, Reprinted in Legislative History at 453 (Sen. Schweiker) (". . . we must be sure that due process is observed through a judicial hearing"); 116 Cong.Rec. 38393, Reprinted in Legislative History at 1050 (Rep. Michel); 116 Cong.Rec. 38702, Reprinted in Legislative History at 1058 (Rep. Steiger); 116 Cong.Rec. 37338, Reprinted in Legislative History at 425 (Sen. Dominick) ("all he has to do one man, as an inspector is to call the regional office or somebody else in the Labor Department and shut down the whole plant immediately, by an order, without any court findings, without any adjudication, without any due process."); 116 Cong.Rec. 37602, Reprinted in Legislative History at 453 (Sen. Schweiker); 116 Cong.Rec. 37604, Reprinted in Legislative History at 458 (Sen. Schweiker) ("I do not see why we cannot assure that due process is available before a lot of people are thrown out of work or an enterprise is shut down.")
 
 
 [47]
 See H.Rep.No.91-1291, 91st Cong. 2d Sess. 56 (1970), Reprinted in Legislative History at 886 (minority views) (". . . the all powerful inspector would become a pawn in labor disputes. . . . and in many cases he would be requested to inspect a plant simply to harass or intimidate employers."); 116 Cong.Rec. 38393, Reprinted in Legislative History at 1050 (Rep. Michel); 116 Cong.Rec. 38374, Reprinted in Legislative History at 1052 (Rep. Bloomfield) (". . . Labor Department inspector . . . may choose to shut down a plant arbitrarily and may be influenced by business or union pressure"); 116 Cong.Rec. 37346, Reprinted in Legislative History at 448 (Sen. Tower) ("power . . . could easily be abused, culminating in a breakdown of existing Governmental neutrality in labor-management relations")
 
 
 [48]
 See fn. 45 and accompanying text
 As indicated in fn. 42, Congress kept adding more and more restrictions on the Secretary's proposed shut down powers, only to conclude in the end that the restrictions were insufficient and the power should be taken away entirely.
 Filing suit against the inspector, of course, would be an ineffective after-the-fact gesture subject to an immunity defense. See Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); Granger v. Marek, 583 F.2d 781 (6th Cir. 1978).
 
 
 [49]
 See fn. 13, Supra
 
 
 [50]
 See 123 Cong.Rec. S10286-S10305 (daily ed. June 21, 1977); 123 Cong.Rec. H7184-H7221 (daily ed. July 15, 1977). See also House Conference Report No. 95-655, 37-68 (1977), Reprinted in 1977 U.S.Code Cong. & Admin.News, pp. 3485-3516
 
 
 [51]
 As of this writing, OSHA covers all businesses affecting interstate commerce. 29 U.S.C. § 652(5). See Godwin v. O. S. H. R. C., 540 F.2d 1013 (9th Cir. 1976). The Mine Health and Safety Act covers all mining. 30 U.S.C. §§ 802(h)(1), 803